SCHMIDT *v.* STATE OF INDIANA.

[No. 967S87. Filed December 29, 1970. Rehearing denied March 23, 1971.]

*Patrick N. Ryan, Jack B. Welchons,* of Marion, for appellant.

*Theodore L. Sendak,* Attorney General, *Richard V. Bennett,* Deputy Attorney General, for appellee.

GIVAN, J.—The appellant, together with one Glenn Everett Stewart, was charged by indictment with the crime of first degree murder of the appellant's husband, Larry Lee Schmidt. The indictment alleged that Larry Lee Schmidt died on the 7th day of May, 1966.

The record before us discloses the following facts:

For approximately one year prior to the death of the decedent the appellant, Edith Louise Schmidt, and Glenn Everett Stewart, had been having an affair. The decedent was aware of this situation and had attempted to break it up. During this period of time the appellant was committed to a mental institution for a short period (less than twenty days). After her release, both she and her husband attempted to persuade Stewart to stay away from their home.

On Friday evening, May 6, the evening before the alleged killing, Stewart came to appellant's home and attempted to persuade her to leave with him. This she refused to do. He told her if she would not leave with him he would kill her husband. Appellant claims that she did not believe he would actually kill her husband. However, the conversation between Stewart and the appellant continued concerning the killing of appellant's husband. Stewart then drove the appellant to a shopping center where he purchased a hatchet and a hacksaw. His stated intention was that they were to be used to dismember the body of appellant's husband after he had killed him.

That evening the appellant returned home where she spent the evening with her husband.

The following day the decedent went to work at 4:00 P.M. Stewart came to the Schmidt home at about 7:30 P.M. bringing the hatchet and hacksaw with him. He stayed a few

minutes then left, but returned again before the decedent came home from work at approximately 11:55 P.M. When the decedent arrived, the appellant let him in. Almost immediately an argument ensued between the decedent and Stewart. The decedent proceeded to his bedroom, followed by Stewart. In an ensuing fight, the decedent was stabbed in the heart by Stewart. The appellant claims Stewart then forced her to clean the blood stains from the floor and help him to move the decedent's body to the basement.

After taking the body to the basement, Stewart and Mrs. Schmidt returned to the main floor of the house.

On three different occasions during the next day (Sunday) the appellant's brother came to the house. On these occasions Stewart hid "upstairs between the closets in the bathroom, it wasn't finished, you can go up in the attic."

After dark Sunday evening Stewart returned to the basement and spent the evening dismembering decedent's body.

On Monday Stewart took the appellant and her children to Arkansas, where appellant claims she and her children were held by Stewart as prisoners. She recites a sordid story of abuse at the hands of Stewart, of exposure in the swamps and forests of Arkansas and how she helped Stewart totally dismantle the automobile which they had driven from Indiana. She finally obtained money from Stewart, which she used to transport herself and her children via bus to the home of her parents in Sparta, Tennessee. At the trial Stewart's mother testified that at the time appellant obtained money from Stewart they embraced each other and kissed before the appellant left for Tennessee.

Up to this time authorities in Marion, Indiana, were unaware of the death of the decedent.

The first knowledge any law enforcement officer had concerning the crime of which appellant now stands convicted was a call from the appellant herself to the Sheriff of White County, Tennessee, in his office at Sparta on Sunday, May 22,

1966. At that time she registered a complaint with the Sheriff that she and her two children had been kidnapped by a man named Stewart, after he had first killed her husband in Marion, Indiana. That following the killing of her husband, Stewart had forced the appellant and her children to accompany him to Arkansas, where after a period of captivity she managed to effect her escape. Upon receiving this call, the Sheriff went to the home of appellant's mother and stepfather and obtained information in more detail of her alleged kidnapping and the death of her husband. The information thus obtained was transmitted to police officers in Marion, Indiana. Acting upon this information they went to the home of appellant in Marion where they discovered the dismembered body of her deceased husband.

Upon being informed that the appellant would willingly return to Indiana as a material witness against Stewart, police officers from Marion traveled to Sparta, Tennessee, where the defendant was again interviewed and a tape recording made of the interview.

It is true there was no warning given as described in *Miranda* v. *Arizona* (1966), 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, prior to the making of this tape recording. Up to this time the appellant had not been arrested or confined. Her appearance at the Sparta police station was entirely voluntary. She voiced her willingness to return to Indiana and in fact signed a witness' release stating that she was willing to return to Indiana with the Marion police officers. One of the officers testified that this release was necessary in view of the fact that she was a woman and that she would be traveling with two male officers; that no female officer was in attendance and they wanted to make sure she was going freely and voluntarily.

The tape which was made in Sparta, Tennessee, was introduced in evidence as State's Exhibit 4. Standing alone it is entirely exculpatory and is merely a statement made by the appellant in which she describes the killing of her husband

and the kidnapping of herself and the children at gunpoint by Stewart.

The Marion police officers transported appellant to Marion, Indiana, arriving around 10:00 o'clock in the evening. The testimony by the officers was that this was strictly because she was a material witness, and at the time she was transported she was not considered as a suspect. Upon arriving in Marion, she was immediately taken to the home of her brother. There was no restraint or incarceration of any kind. Before leaving her at her brother's home the police officers did ask her to come to the police station the next day in order that they might obtain further information.

The next day at approximately 11:00 A.M. the appellant voluntarily appeared at the Marion police station. In the meantime the officers had replayed the tape made in Sparta and had made other investigations concerning the case. When the appellant appeared at the police station she was immediately informed by the officers she was now a possible suspect in the case, and the constitutional warnings required by the *Miranda* case were immediately given. Officer Harrigan gave three of the four warnings required by the *Miranda* case and Officer Hickman immediately added a fourth warning, that is appellant's right to remain silent.

It is true that the appellant testifying in her own behalf at the trial stated that the warnings either were not given or she did not recall the warnings being given by the police officers. Appellant argues that the statement of police authorities that they gave the proper warnings is not believable because the entire proceedings were recorded on tape recording machines with the exception of the warnings, which the officers claim to have given. Although it might have been better had the warnings been recorded at the police station, the fact that they were not recorded does not mean that they were not given, and certainly does not entitle us to wholly ignore the express statements of the police officers that the warnings were given. This, of course, presents a

conflict of evidence in the trial court which was within the province of the jury to weigh and not within the province of this Court to determine. *Smith* v. *State* (1969), 252 Ind. 425, 18 Ind. Dec. 189, 249 N. E. 2d 493.

This Court has previously recognized that "custodial interrogation" as defined in *Miranda* does not apply to every statement made to police by a person concerning a crime. *Smith* v. *State, supra.* See also *Maxey* v. *State* (1969), 251 Ind. 645, 16 Ind. Dec. 526, 244 N. E. 2d 650.

The U. S. Supreme Court in *Miranda* had this to say concerning situations such as those in the case at bar. They stated at page 477:

"* * * General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

The case at bar bears remarkable similarity to a case decided by the Court of Appeals of the District of Columbia in which a woman reported that some other men had stabbed a man in her house. The police responded to her call and took a statement from her in which she named others as the perpe-

trators of the crime. Upon investigating the police found a dead man in bed in the complaining woman's house. They questioned her about his habits and told her she would need to come to police headquarters as a witness and that she would be taken home after making her report. At the police station the officer interviewed the woman for about two hours, then while she was waiting for a driver to take her home she suddenly confessed to stabbing the man herself. Here the police officer testified he had considered her original story plausible and had not really considered her a suspect until she made her confession. The Court held that the oral admissions made by the woman were not the product of custodial interrogation. *Hicks* v. *U. S.* (1967), 127 App. D. C. 209, 382 F. 2d 158. In so doing the Court stated at page 162:

> "* * * The investigation here was not initiated by the police but came after Appellant voluntarily reported a homicide; Appellant, not police, set the inquiry in motion. Nor was there any 'custodial interrogation' in the *Miranda* sense. Questioning of a witness cannot be characterized as 'custodial interrogation' simply because it occurs at a police establishment. Nor is there anything in the record to indicate that Appellant had been deprived of her freedom of action in any significant way; since she never attempted to leave the presence of the police, it cannot be said that her presence at Headquarters was against her will, especially as it is now clear that her conduct and very presence at the police station were part of her attempt to put the police on a wild goose chase in search of the mythical 'jitterbug' attackers."

The Court also stated at page 161:

> "* * * Appellant was taken to Police headquarters to secure a written statement from her as a material witness in a homicide case. * * *

> "Advising Appellant they wanted her to come to Headquarters, rather than 'requesting' or 'inviting' her, does not alter our view. See *Hutcherson* v. *United States*, 122 U. S. App. D. C. 51, 53, 351 F. 2d 748, 750 (1965); *Scarbeck* v. *United States*, 115 U. S. App. D. C. 135, 152, 154, 317 F. 2d 546, 563-565 (1962), cert. denied, 374 U. S. 856, 83 S. Ct. 1897, 10 L. Ed. 2d 1077 (1963). An assumption that

one is required to cooperate with the police can hardly be equated with an arrest; every citizen has a duty to assist police officers up to the point of self-incrimination. The cooperative innocent person would find it oppressive indeed if courts were to hold every person interrogated must first be taken before a magistrate and subjected to the judicial processes applicable to a person criminally charged, i.e., warned that he had a right to maintain silence and to counsel as a preliminary to interrogation."

Courts throughout the country have held that where a person calls or comes in to a police station on their own, being in no way compelled to come to the police station or to answer questions, no custodial interrogation has taken place within the meaning of *Miranda*. See *Freije* v. *U. S.* (1969 1st Cir.), 408 F. 2d 100, *People* v. *Peterson* (1967), 251 Cal. App. 2d 676, 59 Cal. Reptr. 694.

Of course, when such a person giving voluntary information to the police becomes a suspect, the police must then give the warning. This they did in the instant case.

The custodial interrogation of the appellant did not begin until she arrived in the Marion police station at 11:00 A.M. on May 23, 1966.

Appellant claims error in that there was insufficient evidence to sustain the verdict of the jury, and that the verdict was contrary to law. It is her contention that no reasonable man could possibly be convinced by the evidence that she was guilty of being either a principal or accessory before the fact. However, as above recited, there was evidence submitted to the jury that appellant knew Stewart was intending to kill her husband; that she had been with Stewart when he purchased a hatchet and a hacksaw with the stated purpose of dismembering decedent's body. That after having such information the appellant failed to warn her husband. That she went to the front door and admitted him knowing Stewart was waiting in the house for the avowed purpose of killing the decedent.

Various statements made by appellant to the authorities and received in evidence indicate the appellant full well knew the plans of Stewart to kill her husband and aided him in carrying out these plans. Yet these statements are constantly interspersed with protestations of innocence claiming that she cooperated with Stewart only through fear for her personal safety and for the safety of her children. It was within the province of the jury to weigh these statements by the appellant and from their overall content to determine what part, if any, she actually played in aiding Stewart in the commission of the crime. We hold that the evidence is sufficient upon which a jury could reasonably believe the appellant was in fact an accessory before the fact to the killing of her husband. We have repeatedly stated that we will not weigh the evidence. *Smith* v. *State, supra.*

Appellant next contends her conviction was contrary to law because she was charged with first degree murder and was actually convicted as an accessory under Burns Ind. Stat., 1956 Repl., § 9-102. We find no merit in this contention. The statute specifically permits the charging of an accessory as a principal. *Brunaugh* v. *State* (1910), 173 Ind. 483, 90 N. E. 1019.

Appellant claims that the case should be reversed because the State did not meet its burden of proving the appellant guilty beyond a reasonable doubt because she was convicted on her own statements which were intended by her to be exculpatory, and if they are believed at all they must be believed in their entirety. With this we cannot agree. This Court in the case of *Martin* v. *State* (1956), 236 Ind. 504, 141 N. E. 2d 455, had occasion to pass on this specific question. In that case the appellant had been convicted of shooting another person in what he claimed was a fight in which the deceased person grabbed a gun from his pocket and in the struggle the gun accidentally discharged, causing the deceased's death. The State had no other evidence of the existence of the gun except for the defendant's own statements,

yet the jury in order to convict him was forced to on the one hand rely on his statements to establish the use of the gun and on the other hand disbelieve his statements as to the facts surrounding the shooting. This Court stated at page 507 of the opinion:

> "No witness who observed the second fight saw the gun at any time and it was never recovered or put in evidence. However, the appellant both at trial and in his confession admitted that the gun which fired the shot was his. The medical examiner found no powder burns on the hands, clothes or body of the deceased. A photograph of the body introduced in evidence shows the bullet wound well over on the left side. Although there is no evidence whether the decedent was right or left handed, she was not a large woman, nor were her arms large and muscular. The jury was amply justified in finding that appellant's testimony that decedent shot herself with a twelve inch pistol held in her left hand to cause the bullet to enter her body and take the course it did was so difficult and unreasonable that his explanation of the shooting was false."

In criminal prosecution though we are bound to strictly enforce the constitutional rights of the accused, this does not mean that we are engaged in a game which prevents the trier of fact from making reasonable examination of the evidence and drawing the proper conclusions therefrom. To say that a jury must be required to either believe a defendant's testimony in its entirety or disbelieve it in its entirety would be to remove justice from the realm of reason and place the jury in an unrealistic straitjacket in their quest for the truth.

Appellant next alleges the trial court erred in sustaining the State's demurrer to the appellant's plea in abatement. The appellant filed a plea in abatement which stated in substance that the State had forced her to obtain a change of venue from the county by reason of the release of adverse publicity in Grant County. She claims this is a violation of her rights under Article 1, Section 13, of the Indiana Constitution which grants her a fair trial by an

impartial jury in the county where the offense is committed. By her plea in abatement she asked that the prosecution abate because she could not have a fair trial in Grant County and should not be forced to take a change of venue to another county. The only authorities which she cites in support of this proposition include the celebrated cases of *Sheppard* v. *Maxwell* (1966), 384 U. S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507, and *Irvin* v. *Dowd* (1961), 366 U. S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639, for the proposition that under the constitution a person is entitled to a fair trial and may not be forced to go to trial in a county where prejudice has occurred. We find no authority which supports appellant's contention that she cannot be forced to go to trial in a county to which the venue has been changed because of the alleged prejudice in the county where the offense was committed. We hold the trial court was correct in sustaining the State's demurrer to this plea in abatement. We do not believe the Constitution of the United States or the Constitution of Indiana was ever intended to cause an indefinite postponement in the trial of criminal cases. In none of the cases cited by the appellant did the courts suggest that the cases be indefinitely postponed. The mandate is for a change to a distant county if need be, to a place where there is no local bias and prejudice which would prevent a fair trial. *Irvin* v. *Dowd, supra;* C. R. 12 of Indiana Rules of Procedure.

Appellant next claims error on the part of the trial court in admitting State's Exhibit No. 16 into evidence. This exhibit is a photograph of the decedent's torso and severed limbs. To support her contention in this regard the appellant cites the case of *Kiefer* v. *State* (1958), 239 Ind. 103, 153 N. E. 2d 899. The objection in the *Kiefer* case was that the questioned photographs did not show the position of the parties to the crime nor did they correctly show the wounds of the victim which caused her death. The court held that they did not "shed any light on any issue" or serve to enlighten the jury on any issue of fact, but served only to arouse passion

and prejudice. The Court did observe in the *Kiefer* case at page 114:

"We recognize that photographs of a corpse are admissible in evidence even though they portray a gruesome spectacle and may arouse passion and resentment against the defendant in the minds of the jury, *but* such photographs must be *material* and *relevant* and *tend to prove or disprove some material fact in issue.*"

In the case at bar there was evidence that Stewart with the cooperation of the appellant planned to murder the victim and to dismember his body in order to facilitate its removal from the premises. The photograph tends to substantiate this evidence by showing a dismembered human body identified as that of the victim in this case. One could hardly expect such a picture to be other than gruesome. This does not mean that it was inadmissible. *Wilson* v. *State* (1966), 247 Ind. 680, 221 N. E. 2d 347, 9 Ind. Dec. 401; *Brown* v. *State* (1969), 252 Ind. 161, 247 N. E. 2d 76, 17 Ind. Dec. 296. We hold the trial court did not err in allowing the jury to view the photograph of the remains of the victim.

Appellant next claims the court erred in permitting the appellant to be tried before Stewart was tried. To support this proposition appellant cites *Kyser* v. *State* (1966), 247 Ind. 482, 217 N. E. 2d 585, 8 Ind. Dec. 527. We do not interpret the *Kyser* case as supporting appellant's contention. It is true this Court stated in that case at page 485:

"In order for the evidence to be sufficient to justify a conviction of an accessory, it must also show the guilt of the principal."

This does not mean that the principal must first be convicted or enter a plea of guilty before an accessory can be tried. Such an interpretation of the rule would create an absurd situation. Suppose the principal to a murder was killed by authorities during apprehension or died from any cause before his known accessory could be brought

to trial. Appellant's interpretation would mean that the accessory could never be tried for the crime. We interpret the *Kyser* case and all cases of like import to require that the State has the burden to show the guilt of the principal beyond a reasonable doubt as part of its case in a conviction of the accessory. This was certainly done in the case at bar. The fact that Stewart had not yet been tried when the appellant was tried did not prevent her trial and conviction.

Appellant next claims that State's Instruction No. 1 misled the jury. State's Instruction No. 1 reads as follows:

"You are further instructed that to actively countenance and support the doing of a criminal act by another is to encourage it, within the meaning of the aiding and abetting statute just read to you; and a person encouraging the commission of a felony is guilty as a principal and subject to the same prosecution and conviction as the principal."

to which the appellant made the following objection:

"Defendant objects to State's tendered Instruction No. One because the accessory statute, Burns' sec. 9-102 requires an active participation in the crime and the countenancing of a criminal act does not suffice under the Statute.

"(2) the instruction states that encouragement comes under aiding and abetting, which would make the accused a principal in the second degree. Whereas, encouragement is one of the acts which can make an accused an accessory before the fact.

"(3) If the instruction fails to define encourage or encouraging as required by the rule of ejusdem generis under which encourage must require the same guilty of active participation as the words, 'aid, abet, counsel, hire, command or procure.'"

We see no merit to appellant's objection. This Court has stated:

"* * * While it is true that the mere presence of a person at the scene of a crime is insufficient to constitute him a principal therein, in the absence of anything in his conduct showing a design to encourage, incite, aid, abet or assist in the crime, the trier of the facts may consider

failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that he assented to the commission of the crime, lent his countenance and approval thereto and thereby aided and abetted it." *Mobley* v. *State* (1949), 227 Ind. 335, 344, 85 N. E. 2d 489.

We hold the instruction is, therefore, correct, and the trial court did not err in reading it to the jury.

Appellant next alleges that the trial court erred in reading State's Instruction No. 3 to the jury which instruction reads as follows:

"The presence of one at the scene of a commission of a crime and companionship with another engaged therein, and a course of conduct before and after the offense, are circumstances which may be considered in determining whether such person aided and abetted the commission of such crime."

The appellant made the following objection to the giving of this instruction:

"Defendant objects to State's tendered instruction #3 (1) because it invades the province of the jury. (2) it highlights certain circumstances without listing all the circumstances which the jury may consider in determining whether a person aided and abetted in the commission of a crime. (3) The instruction concerns 'the presence of one at the scene of a commission of a crime and companionship with another therein when the rule can only apply to presence and companionship with the principle in the first degree.' "

We see no merit in the appellant's objection to this instruction. The instruction is complete in itself and does not inform the jury that they can merely rely upon the presence and companionship of the aider and abetter but also conjunctively instructs that they consider the course of conduct before and after the offense. Taken in its entirety the instruction is proper, and we cannot see how it could mislead the jury in any way. *Mobley* v. *State, supra.*

The trial court is, therefore, affirmed.

Hunter, C.J., Arterburn and DeBruler, JJ., concur; Jackson, J., dissents with opinion.

### DISSENTING OPINION

JACKSON, J.—I am unable to concur in the majority opinion and dissent thereto.

Appellant was charged by indictment with the crime of first degree murder, said indictment reading in pertinent part as follows:

> "The Grand Jury of the County of Grant, State of Indiana, upon their oath do present that GLENN EVERETT STEWART and EDITH LOUISE SCHMIDT, on the 7th day of May, 1966, at the County of Grant, State of Indiana, did unlawfully, feloniously and purposely and with premeditated malice, kill and murder one LARRY LEE SCHMIDT, by then and there unlawfully, feloniously, purposely and with premeditated malice, stabbing said LARRY LEE SCHMIDT through his heart with a sharp instrument as a result of which stabbing and wound the said LARRY LEE SCHMIDT did then and there die, being contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Indiana."

On May 27, 1966, warrants were issued out of the Grant Circuit Court for the arrest of the defendants so named in the indictment. On June 9, 1966, the Grant Circuit Court issued the following order:

> "Court being duly advised that it has the duty to guarantee fair trial from prejudicial publicity and the cause herein has received certain publicity, court now issues contempt order herein prohibiting counsel involved, Prosecuting Attorney of Grant County, Indiana, and Law Enforcement Agencies of Grant County, Indiana, from communicating with or making public statements to news-media on any aspect concerning probably evidentiary matter of this cause herein for purpose of insuring judicial processes against any prejudicial outside interferences."

On June 20, 1966, appellant filed her answer in abatement, said plea in pertinent part reads as follows:

"Defendant Edith Louise Schmidt, for her plea in abatement, says that:

1. The indictment herein charges her and Glenn Everett Stewart with the murder of her husband, Larry Lee Schmidt.

2. On or about 24 May 1966 Ted Null, Marion police chief, stated to all available news media that she was involved in said murder. Most news media in Indiana reported this announcement; the newspapers and radio and television stations in Grant County gave it special prominence.

3. 8 June 1966 said Null called a press conference at police headquarters in Marion City Hall. At this televised press conference, Null and Stewart's attorney told the assembled reporters and the television audience that a polygraph test had conclusively proven Stewart's innocence and this defendant's guilt.

4. News media in Grant County include two daily newspapers, the Marion Leader-Tribune and the Marion Chronicle, radio stations WBAT and WMRI, and television station WTAF. These news media reach virtually every adult resident of Grant County.

5. News media from elsewhere in Indiana also reach most adult residents of this county.

6. Station WTAF, Marion, televised and telecast the aforesaid news conference. Most news media in Indiana carried full reports of said conference, including the prejudicial statements of Null and said attorney. Newspapers and stations in Grant County gave special prominence to these reports and statements.

7. This improper, televised press conference called by said Null, and conducted by him and Stewart's attorney at Marion City Hall, amounted to a public kangaroo trial of this defendant effectively designed to prejudice potential jurors against her and to deprive her of her constitutional right to a fair trial, by an impartial jury, in this county.

8. In consequence of the foregoing, an impartial jury could not now be impanelled for the trial of this defendant.

9. The misconduct of said Null, as chief of Marion police, and the prejudicial statements and reports aforesaid, have effectively denied this defendant her constitutional right to a fair trial, by an impartial jury, in Grant County.

WHEREFORE said defendant asks abatement of this action and all other proper relief."

The State filed its motion to strike appellant's answer in abatement on June 23, 1966. Said motion to strike was overruled by the court on July 5, 1966. On July 15, 1966, the State filed its demurrer to appellant's answer in abatement, said demurrer reading in pertinent part as follows:

"Plaintiff STATE OF INDIANA demurs to the ANSWER IN ABATEMENT filed by defendant EDITH LOUISE SCHMIDT for the reason that said ANSWER does not state facts sufficient to abate the action stated in the Indictment.

*Memoranda*

Defendant's Answer in Abatement is addressed solely to the point that publicity given the crime allegedly committed by the defendant has not prevented her from receiving a fair trial in Grant County, Indiana. First of all, defendant should not be permitted to claim such prejudicial publicity since defendant herself gave birth to the publicity which the case has had. Secondly, if the action is abated, the defendant would be then free from any further action in this case since the publicity can hardly now be retracted and erased from the minds of those who read and heard it. Thirdly, publicity given to such a crime does not constitute grounds for abatement of a criminal action; if defendant feels she cannot have a fair trial in Grant County, Indiana, she can seek change of venue to some other county."

The court sustained the State's demurrer to appellant's answer in abatement on August 5, 1966.

On November 3, 1966, defendant Stewart filed his motion for severance, and the court granted him a separate trial.

On December 2, 1966, appellant filed her motion to suppress evidence, said motion reading in pertinent part as follows:

"*MOTION FOR SUPPRESSION OF EVIDENCE*
Defendant Edith Louise Schmidt respectfully shows the Court that:

1. On or about 23 May 1966 the Sheriff of White County, Tennessee, arrested her without a warrant, and took her to the White County Jail, in Sparta, Tennessee. The investigation of an alleged murder then focused upon her.

2. Defendant was then held a prisoner, in custody at said Jail. Then and there said Sheriff and policemen from Marion, Indiana, interrogated her at length.

3. At the outset of such interrogation, she was not informed, in clear and unequivocal terms, that she had a right to remain silent.

4. At the outset of such interrogation, she was not warned that anything she said could be used against her in Court.

5. At the outset of such interrogation, she was not clearly informed that she had a right to confer with an attorney before questioning, and to have the attorney with her during interrogation.

6. At the outset of such interrogation, she was not informed that if she was indigent a lawyer would be appointed for her prior to any questioning.

7. In the circumstances, the interrogation of this defendant violated her privilege against self-incrimination, guaranteed by the Federal Constitution.

8. Throughout such interrogation, this defendant was denied her right to counsel, guaranteed by the Federal Constitution.

9. Said defendant did not waive any of her constitutional rights.

10. During the afternoon of said day the aforesaid policemen, by artful lies, trickery, and deceit, persuaded defendant to sign certain waivers. By falsely saying they only wanted her as a material witness, and would not bring charges against her, they induced her to waive extradition. They then brought her to the police station in Marion, Indiana, and later that night temporarily released her to her brother.

11. Early the next morning Marion policemen rearrested her without a warrant and took her back to the police station. The investigation of the alleged murder then focused upon her again.

12. Defendant was then held a prisoner at said police station, and policemen then and there interrogated her relentlessly for more than seven hours.

13. At the outset of this interrogation, she was not informed, in clear and unequivocal terms, that she had a right to remain silent.

14. At the outset of this interrogation, she was not warned that anything she said could be used against her in Court.

15. At the outset of this interrogation, she was not clearly informed that she had a right to confer with an attorney before questioning, and to have the attorney with her during interrogation.

16. At the outset of this interrogation, she was not informed that if she was indigent a lawyer would be appointed for her prior to any questioning.

17. In the circumstances, this interrogation of defendant violated her privilege against self-incrimination, guaranteed by the Federal Constitution.

18. Throughout this interrogation, defendant was denied her right to counsel, guaranteed by the Federal Constitution.

19. Before and at this interrogation, she did not waive any of her constitutional rights.

20. The State then filed a preliminary charge of first-degree murder against her, and she was taken to Marion City Court, which held a hearing on said preliminary charge. At this hearing, said Court remanded her to the Grant County Jail.

21. The next morning, 25 May, Marion police took defendant to their police station and again questioned her at length.

22. At the outset of this interrogation, she was not informed, in clear and unequivocal terms, that she had a right to remain silent.

23. At the outset of this interrogation, she was not warned that anything she said could be used against her in Court.

24. At the outset of this interrogation, she was not clearly informed that she had a right to confer with an attorney before questioning, and to have the attorney with her during interrogation.

25. At the outset of this interrogation, she was not informed that if she was indigent a lawyer would be appointed for her prior to any questioning.

26. In the circumstances, this interrogation of defendant violated her privilege against self-incrimination, guaranteed by the Federal Constitution.

27. Throughout this interrogation, and at the aforesaid preliminary hearing, defendant was denied her right to counsel, guaranteed by the Federal Constitution.

28. Before and at this interrogation, she did not waive any of her constitutional rights.

29. Before and during all these interrogations, and at said hearing, and until 11:00 A.M. on 25 May 1966, defendant had no attorney to advise and represent her. During these interrogations, she neither had the opportunity nor the funds to hire an attorney, and none was assigned to her.

30. During these interrogations, she may have made one or more statements.

WHEREFORE said defendant asks that any statements and other evidence elicited from her on 23 May, 24 May, and 25 May 1966 be suppressed, and not be used against her or any other person, and that she be granted all other proper relief."

The court overruled appellant's motion to suppress on December 12, 1966.

On November 25, 1966, appellant entered a plea of not guilty to the crime as charged and requested a trial by jury. Appellant, on November 28, 1966, filed her affidavit for change of venue from Grant County, and the court granted this motion the next day. Venue was changed to Jay County, and the court ordered the clerk to send to Jay County a transcript of all the proceedings herein, together with all pleadings and papers filed. This cause No. 7430 in the Grant Circuit Court became cause No. 5989 in the Jay Circuit Court.

The trial of this cause began on March 20, 1967, with voir dire examination of prospective jurors. Also on said date appellant filed a verified motion for production of the tapes made of her interrogation by the Marion police. On March 24, 1967, the jury was selected and sworn. On April 3, 1967, the State rested, and the defendant then moved for a directed verdict of acquittal. The court overruled this motion, and after defendant presented her evidence she filed a second motion for directed verdict, which the court also overruled.

On April 4, 1967, the jury returned the following verdict:

"We, the Jury find the Defendant, Edith Louise Schmidt, guilty of murder in the First Degree and that she shall be imprisoned in the State Prison during life. We further find that her true age is twenty-six years."

On April 14, 1967, a pre-sentence investigation report was filed by the probation officer of Jay County. On the same date, the court sentenced appellant to life imprisonment in the Indiana Women's Prison.

Appellant filed her motion for new trial on May 1, 1967; said motion contained sixteen (16) grounds accompanied by memoranda, addenda to certain specifications, questions, objections, motions and rulings of the court, as well as certain instructions, objections thereto, arguments and rulings. It is obviously impossible to include so much record in this opinion, consequently only brief mention will be made of the various grounds.

1. The court erred in admitting State's Exhibit No. 16 into evidence over objection. Exhibit No. 16 is a photograph of decedent's dismembered corpse.

2. The court erred in overruling defendant's motion, made at the close of all the evidence, to instruct the jury to return a verdict for the defendant.

3. The court erred in overruling defendant's motion, made at the close of the State's evidence, to instruct the jury to return a verdict for the defendant.

4. The court erred in sustaining the State's demurrer to defendant's plea in abatement.

5. The court erred in denying defendant Schmidt's motion to suppress evidence.

6. The court erred in allowing the State to force or compel the defendant to relinquish her constitutional right to be tried in the county wherein the alleged crime occurred.

7. The court erred in refusing to give to the jury, at the request of the defendant, defendant's proposed instruction No. 1, which was written, tendered, and requested by the defendant.

8. The court erred in giving to the jury, at the request of the State, each of the State's tendered instructions numbered one and three, to the giving of which defendant timely ob-

jected by oral objections. The objections are set out in the record but omitted here.

9. The court erred in admitting into evidence, over the objection of the defendant, State's Exhibit No. 4 which purports to be her statement. She claims the taking thereof violated her privilege against self-incrimination and right to counsel guaranteed by the Federal and Indiana Constitutions. She noted that *Miranda* v. *Arizona* (1966), 384 U. S. 436, required the exclusion of said exhibit. This objection, together with objections to State's Exhibits Nos. 5, 6, 7, 8 and 9 was tried by the court in a special fact-finding hearing outside the presence of the jury. Defendant incorporates her detailed objections and argument which appear in the record of the hearing, all of which is omitted here.

10. The court erred in admitting into evidence, over the objection of the defendant, State's Exhibit No. 5. This exhibit was among those discussed in the preceding paragraph, and the language contained therein applies with equal force here.

11. The court erred in admitting into evidence, over the objection of the defendant, State's Exhibits numbered 6, 7 and 8. These exhibits were among those discussed in paragraph 9 above, the language thereof applies with equal force here.

The following addenda to Specifications 9, 10 and 11 are hereby incorporated into said specifications and should be considered an integral part thereof:

"9. State's Exhibit #4 was a roll of magnetic tape which contained the recorded part of defendant's interrogation by Marion police at Sparta, Tennessee. The playing of this tape took 35 minutes.

10. State's Exhibit #5 was a typewritten manuscript of six pages, typed by Robert Foust, then Prosecutor of Grant County. It purported to represent defendant's statement to the Marion police. Defendant's alleged signature appeared at the bottom of the last page.

11. State's Exhibit #6 was a roll of magnetic tape which contained the first recorded part of defendant's interrogation by Marion police at the Marion police station. State's

Exhibits numbered 7 and 8 were rolls of magnetic tape which contained, respectively, the second and third recorded parts of said interrogation. When played, Exhibit number 6 ran 50 minutes, and Exhibits numbered 7 and 8 each ran 65 minutes."

12. The court erred in admitting into evidence, over defendant's objection, State's Exhibit No. 9 offered during the direct examination of one Ted Null. This exhibit was a roll of magnetic tape which contained the last recorded part of defendant's interrogation by Marion police at the Marion police station. Said tape took 55 minutes to play. The offer of this exhibit, objections and rulings of the court follow in the record, but are omitted here.

13. The court erred in denying defendant's motion to strike State's Exhibits 5, 6, 7, 8 and 9 made at the conclusion of the State playing the magnetic tapes in Exhibit 9.

14. The verdict of the jury is not sustained by sufficient evidence.

## "MEMORANDUM

The indictment charged defendant Edith Louise Schmidt with first-degree murder, and the jury convicted her of this. First-degree murder requires that defendant (1) unlawfully has killed a human being, (2) purposely, (3) maliciously, and (4) after premeditation. There was not a scintilla of evidence that Edith Schmidt killed anyone.

Having no evidence that Edith committed murder, the State proceeded on the theory that she was an accessory before the fact. To convict her as such an accessory, the State had to prove that (1) Glenn Stewart, the alleged principal, committed first-degree murder, that (2) Edith aided or abetted the murder, or counselled, encouraged, hired, commanded, or otherwise procured its commission, and that (3) she did so purposely, (4) maliciously, and (5) after premeditation. Stewart's intent, malice, and premeditation could not be imputed to her.

The State had to prove all five of these elements. There was no evidence to establish any of them. At most the evidence merely showed that Edith Schmidt was present in the house when an insane man killed her husband. The prosecution failed to prove that Glenn Stewart committed

first-degree murder. The evidence does not show that Edith Schmidt compassed her husband's death. It does not show purpose, malice, or premeditation on her part. Hence it is wholly insufficient to sustain the verdict."

15. The verdict of the jury is contrary to law. Accompanying this specification is a four page typewritten memorandum omitted here in the interest of brevity.

16. The court erred in entering judgment upon the verdict while the alleged principal, Glenn Stewart, remains in custody untried.

The court overruled appellant's motion for new trial on June 29, 1967. Appellant's sole Assignment of Error on appeal is that: "1. The court erred in overruling appellant's motion for a new trial."

The statute under which this prosecution was instituted is found in Burns Ann. Stat. § 10-3401 and reads as follows:

"Murder — First Degree — Penalty. Whoever purposely and with premeditated malice, or in the perpetration of or attempt to perpetrate a rape, arson, robbery, or burglary, kills any human being, is guilty of murder in the first degree, and on conviction shall suffer death or be imprisoned in the state prison during life. (Acts 1941, ch. 148, § 1, p. 447)."

Accessory before the fact is defined by Burns Ann. Stat. § 9-102, which reads as follows:

"Accessory before the fact. Every person who shall aid or abet in the commission of a felony, or who shall counsel, encourage, hire, command, or otherwise procure a felony to be committed, may be charged by indictment, or affidavit, tried and convicted in the same manner as if he were a principal, either before or after the principal offender is charged, indicted, or convicted; and, upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal. (Acts 1905, ch. 169, § 224, p. 584)."

The factual situation in the case at bar is extremely unusual in that the only evidence concerning the actual death of

appellant's husband comes from the appellant herself. From the unsworn statement in writing obtained from the appellant and from certain taped statements made by police officers at Sparta, Tennessee, and Marion, Indiana, it appears that appellant and Glenn Everett Stewart had been having an affair for approximately one year, and that appellant's husband was not only aware of the fact, but had often times tried to break it up. On one occasion he had appellant committed to a mental institution for ten to twenty days, and after her release both had attempted to persuade Stewart to stay away from both appellant and their home. It appears that appellant and her husband were afraid of Stewart.

On Friday evening, May 6, 1966, Stewart was present in appellant's home and at that time told her that he wanted her to leave with him, but she refused to do so. He said that if she didn't he would kill her husband. Appellant claimed that she did not believe that he would kill her husband, but was merely pressing her to accede to his wishes.

At approximately 11:55 p.m. on the following Saturday night, Stewart returned to appellant's home, obviously intoxicated, brandishing a long handled knife with a six-inch blade. Appellant's husband returned home shortly thereafter, and he and Stewart began to argue. Her husband cursed Stewart, went into the bedroom and took off his shirt, and then Stewart walked into the bedroom and began struggling with appellant's husband. Stewart struck him in the chest with the knife, and Schmidt yelled to his wife to call a doctor. She started for the door, but Stewart stopped her, then slapped her. Meanwhile, her husband laid across the bed, blood streaming everywhere. He slid to the floor, tried to get to his feet, but Stewart kicked him knocking him down. Appellant's husband died there.

Stewart then told appellant that if her children saw the body or the blood he would have to kill them, and then he forced her to help him take the body downstairs into the basement. Stewart made her clean up the blood from the floor

and on the rugs. Appellant passed out several times while cleaning up the blood, and Stewart kept slapping her and kept her at it until the mess was cleaned up. Later on Stewart spent hours in the basement cutting up the body, and he threatened that she would die next if she didn't keep her mouth shut.

On Sunday, Edith Schmidt's brother and his wife and family came to the house three times to see his sister and her husband, each time Stewart saw them coming and hid in the attic. He had a .45 pistol and threatened to kill Edith if she talked. Appellant was afraid to say anything to her brother about what had happened, but she told him that her husband was gone and tried to hint that something was wrong.

Early Monday morning, Stewart became frightened and stated to appellant that they would have to leave. Appellant tried to get him to leave without her, but he put her daughter in the car and told her that they would all have to go or harm would befall the child. Stewart drove them to Arkansas where he kept them for eleven days during which time he completely dismantled the car and forced appellant and her children to bury the various parts thereof in the woods. During all of this time Stewart had a rifle, revolver, and ammunition. While in Arkansas Stewart contacted his parents, and he was finally persuaded to allow appellant and the children to visit her parents in Tennessee. She arrived at the home of her mother and step-father, Thurman Conley, near Sparta, Tennessee, on Thursday, May 19, 1966.

When she was sure that Stewart had not followed her, appellant told her mother and step-father what had happened, but they did not believe her. On the following Sunday she called the sheriff of Sparta (White County), Tennessee, a Mr. Joe Cummings. Cummings drove out to the home of appellant's step-father, and there appellant informed him that her husband had been killed in Marion, Indiana. She also told him that "Buzz" Stewart had held her and her two children

in Arkansas and that Stewart had threatened their lives. She gave Cummings the address of her home in Marion. He then returned to Sparta, and called the Marion police. They soon called back and informed Cummings that they had found the body.

Cummings returned to the Conley home, promised appellant protection from Stewart, and told her that she would have to return to Marion. She agreed to return. Cummings called the Marion police and told them to send someone for her. About midnight he went back to the Conley residence, accompanied by ten to fifteen newspaper reporters. They talked to appellant while Cummings listened casually. She told them that her husband had been murdered, that Stewart had held her and her children, and that she and the children had escaped from him. She added that she would return to Marion.

At approximately 11:00 a.m., May 23, 1966, Cummings and two Marion policemen (Officers Harrigan and Eltzroth) drove to the Conley home. The Marion policemen asked her if she was ready to go back to Indiana "to testify and file her complaint." Appellant said that she was. They then drove to Cummings' office at the White County jail, where Harrigan and Eltzroth interviewed appellant. This interview was recorded on tape. About 1:00 p.m. on the same date Harrigan and Eltzroth left for Marion with appellant.

Upon her return to Marion, Indiana, appellant was taken to her brother's home for the night. She was to return to the police station the next day. At 11:00 a.m. the next morning Harrigan saw appellant. The Grant County prosecutor, Investigator Hickman, and approximately twenty reporters were with him. Harrigan took appellant to an interrogation room, about 8 by 12 feet, containing a wooden table and two or three folding chairs; the room was so equipped that a recorder elsewhere could tape a conversation therein. He told her that she might be a suspect, that she had a right to an attorney, and that any statement she made could be used against her. She stated that she did not need the services of

an attorney. The chief of police started the recording equipment. About 2:00 p.m. Harrigan sent for the prosecutor who came to the interrogation room with his secretary, Miss Tremaine. They joined Hickman in the interrogation room and asked appellant if she would give a typed statement. She told them that she would. The statement was typed by the prosecutor as he and Hickman asked the appellant numerous questions. Appellant then signed the typed statement.

Four tapes were taken during the interrogation. The typed statement was identified at the trial as State's Exhibit No. 5. The four tapes were identified as State's Exhibits No. 6, 7, 8 and 9. Portions of said exhibits No. 6, 7, 8 and 9 were inaudible.

Although appellant presented sixteen specifications of error in her motion for new trial and argued extensively on six of these alleged errors in her appeal brief, I deem it unnecessary to encumber this opinion with a discussion of any of them other than those questions which relate to the admissibility of State's Exhibits 4 through 9 and the sufficiency of the evidence presented to the court below.

Appellant contends that the trial court erred in admitting State's Exhibits 4 through 9 into evidence over the timely objections of her counsel, due to the fact that the police, in obtaining said exhibits, violated her privilege against self-incrimination and right to counsel guaranteed by the United States and Indiana Constitutions. Exhibit No. 4, called the "Sparta tape", was a tape recording taken in Sparta, Tennessee; Exhibit No. 5 is a typewritten statement signed by the appellant; and Exhibits Nos. 6, 7, 8 and 9 comprised the taped statements of appellant taken in the interrogation room of the Marion police department.

More specifically, appellant contends that the State did not effectively comply with the law as set forth in the case of *Miranda* v. *Arizona* (1966), 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. Said decision declared quite clearly that a defendant's statement cannot be used as evidence against

him in court if the taking thereof violated his privilege against self-incrimination and right to counsel. *Miranda* very explicitly states that a violation occurs unless the police deliver certain specific warnings at the outset of the interrogation, and the defendant then knowingly and intelligently waives his privilege. A heavy burden of proof rests upon the State and not upon the defendant. It is quite important that the warnings be given at the outset, before the questioning begins, and not after the State secures the statements or confessions that it desires.

The State would dismiss this argument for the reason that the case of *Miranda* v. *Arizona, supra,* was not handed down by the United States Supreme Court until three weeks after the interrogation in question, and that, therefore, the case of *Escobedo* v. *Illinois* (1964), 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977, and the warnings enunciated therein should control. However, in *Johnson* v. *New Jersey* (1966), 384 U. S. 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882, decided June 20, 1966, the Supreme Court held that *Miranda* governs "cases in which the trial began after the date of our decision one week ago." 16 L. Ed. 2d 882, 885. Since appellant's trial did not begin until March 20, 1967, the legal principles announced in *Miranda* clearly govern her case.

The *Miranda* rules apply whenever the police have a suspect in their custody or otherwise restrain him of his liberty. Early in *Miranda* v. *Arizona, supra,* the Supreme Court said:

> "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 16 L. Ed. 2d 694, 706.

Later in the opinion the Court added:

> "The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way. It is at this point that our adversary system of criminal proceedings commences, distinguishing itself at the outset from the inquisitorial system recognized in some countries." 16 L. Ed. 2d 694, 725.

In particular, the *Miranda* rules apply to all questioning in a police station or jail. The whole thrust of *Miranda* is aimed at such interrogation. The Court noted:

> "As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 16 L. Ed. 2d 694, 716.

Again, the Court stated:

> "The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself." 16 L. Ed. 2d 694, 714.

Before interrogation begins, the police must give the suspect four specific warnings. *First,* they must warn him that he has a right to remain silent. The Court said:

> "At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." 16 L. Ed. 2d 694, 720.

If this warning is not given prior to questioning, the statement elicited from the defendant is inadmissible, even though he may actually have known of his right to remain silent.

*Second,* the police must warn the suspect that anything he says may be used against him. On this point, the Court said:

"This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it * * *. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." 16 L. Ed. 2d 694, 721.

*Third*, the police must warn the suspect that he has the right to the presence of an attorney, either retained or appointed, and if he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning. The Court stated:

"Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead." 16 L. Ed. 2d 694, 722.

*Fourth*, the police must inform the suspect that if he is indigent he can have a lawyer appointed for him prior to questioning. The Court stated:

"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one * * *. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it." 16 L. Ed. 2d 694, 723.

The right to counsel during interrogation is essential to the privilege against self-incrimination. The Court said:

"The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today." 16 L. Ed. 2d 694, 721.

The Sixth Amendment to the United States Constitution also guarantees the right to the effective assistance of counsel, and the Fourteenth Amendment extends this right to State proceedings. This Sixth Amendment right also applies to situations in which there is evidence of custodial interrogation. *Escobedo* v. *Illinois, supra; Miranda* v. *Arizona, supra.* Thus, both the Fifth and Sixth Amendments require that the third and fourth warnings enunciated above be given.

The accused need not raise the question of the presence of counsel. The police have the absolute duty to warn him of this right. On this point the Court stated:

"An individual need not make a preinterrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given. The accused who does not know his rights and therefore does not make a request may be the person who most needs counsel." 16 L. Ed. 2d 694, 721.

The burden of proof with respect to whether or not the warnings previously described were in fact given falls heavily upon the State. The prosecution must prove not only that the warnings were given, but also that the defendant knowingly and intelligently waived his privilege against self-incrimination and right to counsel. With respect to such burden of proof, the Supreme Court stated:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against

self-incrimination and his right to retained or appointed counsel * * *. This Court has always set high standards of proof for the waiver of constitutional rights, * * * and we re-assert these standards as applied to in-custody interrogation." 16 L. Ed. 2d 694, 724.

The fact of lengthy interrogation is in itself strong evidence that the defendant did not validly waive his constitutional rights. The Court declared:

"Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 16 L. Ed. 2d 694, 724, 725.

When the State's interrogators testified at the extensive fact-finding hearing on appellant's motion to suppress, held in the Grant Circuit Court, they stated merely that appellant was warned of her rights prior to any questioning by Investigator Hickman in general terms. They said that warnings were given immediately after the introduction; however, when appellant was asked whether or not she was warned of her rights to counsel and to remain silent, she replied either "no" or that she did not recall. On one occasion, she stated, "Well, he (Mr. Hickman) started in on me accusing me the first thing" of killing her husband. (Tr. p. 201). At one point, in response to a question whether or not the police told her of her right to counsel at the outset, she said: "No, not when they started." (Tr. p. 181). This certainly was a clear and unequivocal statement.

The following colloquy also appears in the record at page 182:

"Q. * * * But at the start of this questioning they didn't tell you that you didn't have to talk to them at all?

A. No.

Q. Didn't tell you that you could be quiet, keep your mouth shut. They wanted you to answer the questions? Did they tell you at the beginning of this questioning, Mrs. Schmidt, that anything you said could be used against you in Court?

A. After I signed the statement."

Mrs. Schmidt testified that the officers who interrogated her told her that the judge would appoint a lawyer for her. However, they did not say when and never suggested that she could have a lawyer present in the interrogation room. Instead, she was questioned without the aid of counsel.

The transcript further shows the following significant colloquy:

"Q. Did they tell you that anything that you said could be used against you in Court, this was on the morning of the 25th, Wednesday morning?

A. No, they didn't.

Q. And did they tell you that you had the right to talk to a Lawyer?

A. They told me that the Judge would appoint me a Lawyer.

Q. Did they say when?

A. They didn't give me any specific date or time, no.

Q. But in the meantime they went ahead and questioned you?

A. Yes.

Q. And they didn't get you a Lawyer?

A. No.

Q. Did they tell you that if you didn't have the money to hire a Lawyer that the State of Indiana would get you a Lawyer, would furnish you one?

A. This I didn't know until after I signed the statement, I didn't know if I had to hire one or anything.

Q. But they didn't tell you that, this is when they started questioning you, on Wednesday morning?

A. No, sir.

Q. And they didn't tell you that you could have a Lawyer in with you while they were questioning you?

A. No, sir." (Tr. pp. 183, 184)

The very tenor of the foregoing shows that appellant not only expected, but desired the services of an attorney at the time of her interrogation. Her testimony raises the question why she had no counsel, and was given none, when counsel was so obviously necessary. The right to the effective assistance of counsel at each of the critical stages of the criminal process is meaningless to the accused if the prosecutor is permitted to defer warning the suspect of his rights until after he has successfully trapped the accused. Here the prosecutor's gallant offer then to have a lawyer appointed for appellant—eventually, did not satisfy the constitutional requirement.

The State seeks to justify and support its position with respect to the warnings by relying on the fact that appellant stated that she did not want an attorney and that she would rather "get this whole thing over with." However, a close examination of the record will show that appellant made these statements on Tuesday morning, May 24, 1966, and that the police again, on Tuesday afternoon and Wednesday, May 25, interrogated her without reiterating the substance of the warnings required by *Miranda*. In *Miranda* the Court stated that:

> "If the individual indicates *in any manner, at any time* prior to or during questioning that * * * he wants an attorney, the interrogation must cease until an attorney is present." 16 L. Ed. 2d 694, 723. (Emphasis supplied)

This case certainly differs from *Sampson* v. *State* (1968), 250 Ind. 625, 237 N. E. 2d 254, wherein this Court construed the warnings made necessary by *Miranda* v. *Arizona, supra*. In that case Sampson stated on direct examination that "They

asked me if I would tell them where I was during that period of time *and I told them I didn't have to tell them anything."* Clearly Sampson understood his rights and waived them. Just as clearly Edith Schmidt did not understand fully her rights and did not waive them. When Investigator Hickman testified that he had given her the proper warnings, he did not claim he had stated, at the outset of the questioning, that she could have a lawyer present during the interrogation. There is certainly no corroboration 'for any such preliminary warning. It is, at the very least, a strange coincidence that the police taped virtually all of the interrogation except for the beginning. *Miranda* clearly requires that four specific warnings and an intelligent waiver be given prior to any questioning. Merely informing appellant after she signed the typed statement that she could expect to have a lawyer appointed for her the next day when she went to court did not suffice.

It is quite apparent that State's Exhibit No. 5 (the typed statement) which the prosecutor read to the jury has no initial warnings at all on the face thereof. Some police statements have mimeographed, prefixed warnings which are seldom read to suspects, but which, nevertheless, appear at the top of the page. State's Exhibit No. 5 has no such pro forma. It would be safe to assume that appellant, if given counsel, would not have submitted to interrogation and would not have signed this statement, since the police got no further statements from her after an attorney was assigned to her. This absence of counsel at such a critical time certainly amounted to a denial of counsel in violation of her constitutional rights, particularly for such an uneducated, inexperienced, and disadvantaged person.

At the beginning of the "Sparta tape," State's Exhibit No. 4, Officer Harrigan did tell appellant the following:

"Edith, it is my duty to advise you at this time. I am going to advise you that we are making a tape recording in the above mentioned office, and that anything that is said can be used against you or for you in a court of law and

that you have at this time signed—you understand that first question?

A. Yes." (Tr. p. 315)

I re-affirm, however, that this was only one of the four warnings required by *Miranda,* and it is the only warning which appears on tape. *Miranda* implied requires that complete warnings be given at each separate session of questioning.

Therefore, the State has failed to sustain its burden of proof concerning the giving of the requisite warnings and the judgment of the trial court should be reversed. It was incumbent upon the State to prove that all four warnings were given at the start of each day's questioning. There was some vague evidence of some uncertain warnings at uncertain times, but this does not meet the requirements enunciated by the Supreme Court. There was no corroborated evidence that all four warnings were given at the proper time. The police transcribed taped statements, both at Sparta, Tennessee, and Marion, Indiana; surely, if the proper warnings had been given, they would have been recorded in order that they may have been used as evidence. Miranda contemplates corroborated evidence; the Court stated:

"Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." 16 L. Ed. 2d 694, 724.

Without said warnings so given at the proper times, Mrs. Schmidt could not have knowingly and intelligently waived her Fifth Amendment privilege against self-incrimination and her Sixth Amendment right to counsel. Therefore, the court below erred in admitting, over appellant's objection, State's Exhibits 4 through 9, arrived at in violation of her constitutional rights.

Without intending to unduly belabor this opinion, I do, however, feel compelled to answer the question raised by appellant's allegation that the evidence presented to the

trial court was wholly insufficient to sustain her conviction. A thorough examination of the record in this case reveals that the only evidence presented by the State from which the guilt of appellant could be inferred, if at all, was the taped statements taken during interrogation of appellant at Sparta, Tennessee, and Marion, Indiana (State's Exhibits No. 4, 6, 7, 8 and 9), and the typed statement signed by appellant (State's Exhibit No. 5), *all* of which statements were purely exculpatory in nature. The primary inquiry, therefore, is whether or not the State successfully met its burden of proving appellant guilty of the crime as charged beyond a reasonable doubt, *solely* upon the basis of statements given by her, which by their very nature tended to show that she was innocent.

Although this precise question has been given due consideration by the courts of other jurisdictions, notably Texas, the cases in Indiana directly on point are minimal. However, I do feel that a rule has been sufficiently established in Indiana which would cause the reversal of appellant's conviction here.

In the case of *Buffkin* v. *State* (1914), 182 Ind. 204, 106 N. E. 362, this Court held:

> "If appellant's testimony stood alone to be taken as the whole truth of the res gestae, it would have to follow that he acted in self-defense."

The appellant's conviction in that case was affirmed due to the fact that there was a witness, other than appellant himself, to the immediate acts leading up to the homicide, and that the testimony of said witness was "in irreconcilable conflict in many particulars" with that of appellant, thereby leaving to the jury the function of deciding which testimony to believe.

Such is *not* the case here. There is no other testimony, no other statements rebutting the truth of appellant's statements, nor was there any concrete evidence of probative value to indicate that she was, in fact, guilty of active participation in the murder of her husband.

Citing *Buffkin* v. *State, supra,* this Court in *Pollard* v. *State* (1950), 229 Ind. 62, 94 N. E. 2d 912, stated:

> "It is true that if that part of a statement of an accused which is in his favor is not disproved by other evidence, such favorable portion is deserving of as much consideration as the parts which make against the accused."

In that case also the appellant's conviction was affirmed, however, as the court clearly pointed out on page 68 of its opinion, "* * * the evidence as to the killing is not confined to the written statements." Such fact is not evident in the case at bar.

In *State* v. *Carter* (1961), 254 N. C. 475, 119 S. E. 2d 461, the Supreme Court of North Carolina stated:

> "When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements * * *.
>
> And when the State's evidence and that of the defendant is to the same effect, and tend only to exculpate the defendant, his motion for judgment as of nonsuit should be allowed * * *.
>
> While the State by offering this evidence was not precluded from showing that the facts were different, no such evidence was offered, and the State's case was made to rest entirely on the statements of the defendant, which the state presented as worthy of belief."

The principles enunciated in the aforementioned cases should be controlling in the case at bar. If the State believed appellant's statements concerning the circumstances surrounding the murder of her husband, then she certainly was entitled to an acquittal, for such statements clearly tended to free her of any alleged fault or guilt. If, on the other hand, her statements were not to be believed, then there was absolutely no evidence upon which her conviction could stand.

The judgment of the trial court should be reversed and this cause remanded with instructions to grant appellant's motion for new trial.

NOTE.—Reported in 265 N. E. 2d 219.