BROWN *v*. STATE OF INDIANA.

[No. 1068S175. Filed April 29, 1969.]

Loren H. Kiely, Phillip L. Kiely, of Evansville, for appellant.

John J. Dillon, Attorney General, James H. Voyles, Deputy Attorney General, for appellee.

HUNTER, J.—This is an appeal by Samuel Henry Brown from a verdict and judgment of guilty of second degree murder. Trial was by jury in the Vanderburgh Circuit Court in June of 1968. Judgment was entered sentencing the appellant to the Indiana State Prison for life and disfranchisement for a period of seventeen (17) years.

The assignment of error presents the following questions included in appellant's motion for new trial:

1. The court erred in overruling defendant's written motion to strike out parts of the indictment.

2. The court erred in overruling motion to quash the indictment.

3. The court erred and abused its discretion in overruling defendant's motion for a change of venue from Vanderburgh County.

4. The court erred in overruling the objection of defendant to the introduction and admission into evidence as a part of the State's case-in-chief on direct examination (State's witness Ronald Hewitt) State's exhibit #3.

5. The court erred in overruling the defendant's introduction of State's exhibits numbered 8 and 9 as part of direct examination of State's witness Edward Saulsberry.

6. Court erred in overruling defendant's motion for a directed verdict of not guilty of the charge against him at the close of State's case-in-chief and again at the close of all the evidence.

7. That the verdict of the jury is contrary to law.

8. That the verdict of the jury is not sustained by sufficient evidence.

The appellant presents no argument on alleged errors one (1) and two (2) above and therefore said asserted errors are waived. *Waggoner v. State* (1949), 224 Ind. 177, 65 N. E. 2d 106.

## POINT THREE (3)

The appellant contends the trial court erred and abused its discretion in overruling the motion for a change of venue from Vanderburgh County.

As part of the hearing on the petition for a change of venue the appellant placed in evidence five items from Evansville newspapers which are summarized as follows:

Defendant's Exhibit #1 was a front page news story in the Evansville Press of February 23, 1968, with inset pictures of Amiel Culver, the victim, and Samuel Henry Brown. The story contains a statement that "police are holding . . . Brown, 50, of 844 Lincoln as the suspect in the case". The article also quoted a Detective Captain as saying that "Brown will face preliminary murder charges tonite in City Court." The article also reported that Ronald Hewitt had rushed to Culver's aid and was himself shot and was in critical condition at a local hospital. The article contained sketchy details of the occurrence and indicated that the shooting had followed an argument between "Brown and Culver over money". The article also contained a record of Brown's several previous convictions and paroles. It further stated that at the time of the reported shooting Brown was then on parole from a similar offense.

Defendant's Exhibit #2 was a front page news story published in the Evansville Courier, February 24, 1968, concerning the preliminary hearing in city court. It also contained an inset picture of the victim, Amiel Culver. This article also contained a picture of Brown and his two attorneys showing them sitting at counsel table while present in city court for the preliminary hearing. The article related short resumes of the testimony at the hearing.

Defendant's Exhibit #3 was a copy of an editorial in the Evansville Press published on February 27, 1968, titled "The Police Department's Goof". The first paragraph indicated the police officials should lose no time fixing responsibility for the misplacement of a Kentucky warrant for the arrest of Brown. The editorial commented that this "police department goof may have cost Amiel Culver his life." It also criticised [sic] the department for its failure to check their records claiming that, if they had, they would have known Brown "had a long police record dating back to 1938 and contained four felony convictions." This was followed by an admonition "that the people of the community have a right to expect better of their police department."

Defendant's Exhibit #4 was a news story which appeared in the Evansville Press on March 15, 1968, with an insert picture of Ronald Hewitt, who had allegedly been shot by Brown as he came to the aid of Amiel Culver on February 23, 1968. The picture showed Hewitt poking a finger through the bullet hole of the sweater he had been wearing at the time of the shooting. The article quoted Hewitt as stating "I said a prayer in the ambulance for Mr. Culver, hoping he would not die . . . but it was too late." The article concluded by saying that Samuel Henry Brown had been indicted for second degree murder by the grand jury.

Defendant's Exhibit #5 was published on March 29, 1968, and was a section of the daily column "BISH SAYS". This article referred to two checks being forwarded to Ronald Hewitt by the wife and daughter of Amiel Culver, the slain groceryman, with a statement in the letter of inclosure, "This is for a wonderful guy who would have given his life to save a friend."

It was stipulated that said articles, column, and editorial were duly authenticated copies of said newspapers and were duly circulated throughout Vanderburgh County.

On April 1, 1968, at the hearing on the motion for change of venue there was also evidence presented by Reverend Brown, brother of the appellant, who testified that he was of the opinion the appellant could not receive a fair and impartial trial in Vanderburgh County by reason of said news

stories. He also testified that recent acts of vandalism by Negroes on Lincoln Avenue on the previous Thursday "would affect his brother's having a fair and impartial trial in Vanderburgh County."

Samuel Henry Brown, the appellant, a 50 year old Negro also testified that the items contained in the editorial, the daily column, and news stories represented in exhibits 1 through 5 had been read by him and he had determined he could not have a fair and impartial trial in Vanderburgh County because of them. He also testified specifically that exhibit #3 was prejudicial because it stated "but for the police department goof that this probably wouldn't have happened". Also he testified that the various articles detailing his criminal record prior to his trial would be prejudicial to him in Vanderburgh County, whether or not he took the stand to testify.

On re-cross examination by the prosecuting attorney the record also reveals the following questions and answers:

"Q. Just a minute, Mr. Brown. *You know you have the right, your attorney does, to interrogate every one of the prospective jurors to see if they have read anything about you, you know that, don't you?*

A. *Yes.*

Q. Don't you believe that you can find 12 people in Vanderburgh County, that haven't read about you, that wouldn't be prejudiced?

A. *I don't know, the way it has been circulated, I don't know*" (our emphasis).

The state did not file any counter-affidavits and did not introduced any evidence to contradict, deny or rebut the defendant's presentation at the hearing.

With specific reference to the five (5) exhibits noted above, the appellant cites the cases of *Sheppard v. Maxwell* (1966), 384 U. S. 333; *Rubenstein v. State* (Texas, 1966), 407 S. W. 2d 793; *Irvin v. Dowd* (1961), 366 U. S. 717; and

*Estes v. State* (1965), 381 U. S. 532, as authority for his contention that the trial court committed reversible error in overruling his motion for a change of venue from Vanderburgh County.

To determine the application of said cases, it will be necessary to analyze the record of facts as revealed in the reported cases against the tenor, number and extensiveness of prejudicial contents, if any, in the articles contained in exhibits 1 through 5 in the case at bar. It should be noted that the five items of publicity as revealed by the record were published between February 23, 1968 and March 29, 1968. The appellant's trial began June 25, 1968, almost three months after the last publication.

The appellant in support of his contention of error quotes from *Sheppard v. Maxwell, supra,* as follows:

"With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion . . . Where there is reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the Judge should transfer it to another county not so permeated with publicity."

The appellant specifically contends that the extensive pretrial publicity against him made it impossible for him to have a fair and impartial trial.

With regard to *Sheppard, supra,* the appellee states that "It is incongruous that any comparison could be made concerning the facts of constitutional guarantees in that case with the case at bar." Upon an examination of the *Sheppard* case, we find that several pages of the opinion were devoted to a discussion of news stories prior to and during the trial, to telecasts by various stations in the Cleveland area, and debates which were staged or broadcast over several radio and television stations tending to pre-judge Sheppard's guilt before and during his trial. A nationally recognized news com-

mentator in a broadcast over a Cleveland station "likened Sheppard to a perjurer and compared the episode to Alger Hiss' confrontation with Whitaker Chambers." The record was replete with quotations from news stories, headlines and editorials including the following: an editorial demanding, "Why isn't Sam Sheppard in jail . . . quit stalling—bring him in," and a characterization of Sheppard as "The most unusual murder suspect ever seen around these parts." One article said that "Except for some superficial questioning during Coroner Sam Gerber's inquest, has been scotfree of any official grilling. . . " It asserted further that he was "surrounded by an iron guard of protection and concealment." Headlines announced inter alia that "Doctor evidence is ready for jury," "Corrigan tactics stall case," "Sheppard gay set is revealed by Houk," "Blood is found in garage," "New murder evidence is found police said," "But who will speak for Marilyn?," and "Sam called a 'Jekyll-hyde' by Marilyn, cousin to testify." One story related that the "Prosecutor has a 'bombshell witness' who will testify to Dr. Sam's display of fiery temper, countering the defense claim that the defendant is a gentle physician with an even disposition." There were further quotes that Sheppard was a "bald faced liar" attributed to a police captain.

The above recital from the report of the Sheppard case is a very cursory summation of a part of the publicity surrounding the trial and clearly demonstrates that that case is inapplicable to the facts in the case at bar. The same conclusion may be made with reference to *Estes v. State, supra,* and *Rubenstein v. State, supra.*

In the case of *Irvin v. Dowd, supra,* also cited by the appellant, we find the following summation of the facts reported:

> "An examination of the then current community pattern of thought as indicated by the popular news media is singularly revealing. For example, petitioner's first motion for a change of venue from Gibson County alleged that the

awaited trial of petitioner had become the cause celebre of this small community—so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial. The motion further alleged that the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and that, in addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents. These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing petitioner's execution by the State of Kentucky, where petitioner is alleged to have committed one of the six murders, if Indiana failed to do so. Another characterized petitioner as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories petitioner was described as the 'confessed slayer of six,' a parole violator and fraudulent-check artist. Petitioner's court-appointed counsel was quoted as having received 'much criticism over being Irvin's counsel' and it was pointed out, by way of excusing the attorney, that he would be subject to disbarment should he refuse to represent Irvin. On the day before the trial the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this

case), as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.' " 366 U. S. at 725-26.

The court speaking through Justice Clark stated as a summary conclusion to the above recited facts that:

"Here the build-up of prejudice is clear and convincing." 366 U. S. at 725.

Further the opinion sets forth:

"It cannot be gainsaid that the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of Gibson County. In fact, on the second day devoted to the selection of the jury, the newspapers reported that 'strong feelings, often bitter and angry, rumbled to the surface,' and that 'the extent to which the multiple murders—three in one family—have aroused feelings throughout the area was emphasized Friday when 27 of the 35 prospective jurors questioned were excused for holding biased pretrial opinions . . .' A few days later the feeling was described as 'a pattern of deep and bitter prejudice against the former pipe-fitter.' Spectator comments, as printed by the newspapers, were 'my mind is made up'; 'I think he is guilty'; and 'he should be hanged.' " 366 U. S. at 726-27.

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. *To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard*" (our emphasis). 366 U. S. at 722-23.

The appellee states in its brief that the degree of publicity received by the defendant in *Irvin* was substantially greater

than that received by appellant in the case at bar. In *Irvin* there were 46 exhibits which petitioner attached to his motion which indicated the barrage of newspaper headlines, articles, cartoons and pictures published in the community concerning the case. The town radio and T.V. stations also carried extensive newscasts about the case prior to and during the trial of the case. In the case at bar appellant only presented five exhibits at his hearing on his motion for change of venue along with testimony by himself and his brother.

Another distinguishing factor in *Irvin* was that two-thirds of the prospective members of the jury revealed on voir dire that they possessed a belief in the defendant's guilt. The Supreme Court of the United States thus felt that the partiality and prejudice which was demonstrated by the defendant on this appeal violated constitutional proscriptions.

Appellant in this case filed a written motion to quash and strike the jury and to challenge the array of Petit Jurors. The Court reserved its ruling until after the jurors were voir dired and then denied appellant's motion. The transcript of the proceedings does not contain the questions and answers on voir dire; moreover, the appellant did not raise the question of prejudice among the jury after their selection, and no exception was noted nor presented in appellant's brief challenging such ruling as was done in *Irvin v. Dowd, supra.* We hold that *Irvin* is not controlling of the issue in the case at bar.

We now consider the error asserted on the denial of the change of venue from the county in the case at bar. Suffice it to say in this regard, we believe it is necessary to the determination of the right to said change of venue for the trial court to consider and weigh all factors and rights surrounding the case. The right of the news media to *fairly and accurately report* the news; *the right* of the defendant *to a fair trial before an impartial*

tribunal free of the influence of generated prejudice and inflamed passion in the community; and the right of the citizens to fully *comprehend* and *analyze* the *portent* and *direction* of the administration of our court system are elements necessary to the attainment of justice. If any one of the rights fall, the rest also will surely fall, and the term "justice" will become hollow and meaningless in our constitutional system. Upon the judiciary devolves the duty to maintain, as well as human agency can, the fine and essential balance within and between such tri-partite rights, for such a harmonious weighting is necessary to the preservation of "justice under the law".

We have held that it is within the sound discretion of the trial court to determine the credibility of an application for a change of venue from the county in a criminal case. ██ We have also held that such an application, uncontroverted by the state, *only* establishes a *prima facie* basis for the granting of the application, and that such application should not be *arbitrarily denied* without affording the defendant an opportunity to bolster the credibility of such with supporting testimony. *Hanrahan v. State* (1968), 251 Ind. 356, 241 N. E. 2d 143. *In the instant case a hearing was had.* We hold that it was within the discretion of the trial court to weigh the evidence comprised of both documentary and oral testimony and determine its credibility in light of the purpose sought to be obtained by said application. In such hearing the trial court had the right to weigh the content of the exhibits and determine their effect on the "public attitude" toward the defendant. Certainly the publicity could not be characterized as building "a huge wave of passion" (*Sheppard*) ; neither was it "a build up of prejudice . . . clear and convincing" (*Irvin*). Also, the court in judging the credibility of the appellant and his brother in their supporting testimony had the right and duty to weigh their evidence and take into account their interest in the outcome of the matter then before the court for adjudication.

We therefore hold that the trial court did not exceed its discretion in the denial of appellant's application for a change of venue from Vanderburgh County as alleged in specification #3 of the motion for a new trial.

## POINTS FOUR (4) AND FIVE (5).

Specifications 4 and 5 of motion for new trial are best grouped together for consideration.

The appellant contends that the trial court erred in overruling the objections of the defendant to the introduction and admission into evidence State's exhibit #3, being a photograph of the interior of the grocery store where the killing occurred. This black and white photograph disclosed a large pool of the victim's blood on the floor. This exhibit was shown and passed among the jury for viewing and examination. The appellant cites *Kiefer v. State* (1958), 239 Ind. 103, 114, 153 N. E. 2d 899 to support his contention.

This court in *Hawkins v. State* (1941), 219 Ind. 116, 127, 37 N. E. 2d 79 stated:

> "The general rule as to the admission of photographs in criminal cases is stated as follows:
>
> 'A photograph, proved to be a true representation of the person, place, or thing which it purports to represent, is competent evidence of anything, of which it is competent and relevent for a witness to give a verbal description.' 23 C.J.S. *Criminal Law* § 852, p. 51.
>
> Dean Wigmore states the rule:
>
> 'A photograph, like a map or diagram, is a witness' pictured expression of the data observed by him and therein communicated to the tribunal more accurately than by words. Its use for this purpose is sanctioned beyond question.' 3 Wigmore on Evidence (3rd ed.) § 792, p. 178.
>
> Cited under this text are numerous criminal cases holding proper the admission of photographs picturing the scene of the crime, objects used in its commission, the body of the victim and other details enabling the jury to visualize

what actually occurred. Their relevancy, it seems to us, is determined by the inquiry as to whether or not a witness would be permitted to describe the objects photographed. '. . . ordinarily whatever the jury may learn through the ear from descriptions given by witnesses they may learn directly through the eye from the objects described.' *State v. Moore* (1909), 80 Kan. 232, 237, 102 p. 475, 477. The same rules applicable to objects connected with the crime apply to photographs of such objects. 3 Wigmore on Evidence (3rd ed.) § 792, p. 185.

. . .

We see no reason, therefore, why a witness may not describe in words what he saw and also supplement his testimony with photographs, which frequently give the jury a more accurate picture than the verbal description."

Exhibit #3 shows where the deceased was lying after his struggle with the defendant as well as the interior of the New Gay Way Market. The pictorial depiction was supported by the testimony of Ronald Hewitt upon direct examination.

Furthermore, the *Keifer* case, relied on by the appellant, has not been regarded by this court as a persuasive precedent.

"The Kiefer case is hemmed in and severely limited by the cases before and after it and has very little meaning, if any, as a precedent."

*Wilson v. State* (1966), 247 Ind. 680, 685, 221 N. E. 2d 347

We therefore hold the trial court committed *no* error in the admission of state's exhibit #3 in evidence, and in overruling specification #4 of appellant's motion for new trial.

We now direct our attention to specification #5, which asserted an error of law in trial court's overruling of the appellant's objection to the admission into evidence of exhibits #8 and #9, said exhibits being color photographs of part of the nude body of the victim, Amiel Lewis Culver, taken in the hospital approximately two hours after the killing. Said exhibits depicted the place of entrance of the gunshot wound

in the throat and the exit of the gunshot wound in the back together with some discoloration about the neck.

The appellant objected to the introduction of said exhibits upon the grounds that the photographs showed the body had been probed by some kind of instrument inserted into the gunshot wound and therefore that the body was not in the same condition as it was at the time of the death, and for the further reason that the exhibits are not relevant or material to the issues involved in the trial. The appellant contends that this was prejudicial to the defendant and inflamed the jury, again citing *Kiefer v. State, supra.*

The rule as stated in 2 Wharton's Criminal Evidence, 12th ed., § 687, at pages 658-659 is:

> "Photographs are admissible to show the body of the victim; to establish the corpus delicti; . . . the condition of the victim, the wounds of the victim, and the cause of death; . . ."

Underhill's Criminal Evidence, 5th ed., § 117, states that "photographs which go to illustrate any fact or shed light on an issue, or are relevant to describe person, place or thing involved, are admissible." (p. 213) They "are not inadmissible merely because shocking, horrible or tending to arouse passion or prejudice." (p. 222) "A photograph serving *only*, or *primarily*, to arouse passion or prejudice, will not be received, although the fact that it is not essential to the state's case will not necessarily exclude it." (p. 80, 1968 Supp.)

Relevant to said exhibits Edward Saulsberry, deputy coroner of Vanderburgh County, testified that the photographs were true and correct representations both front and back as shown by said exhibits number 8 indicating the entrance wound and number 9 representing the exit wound in the lower back of Amiel Lewis Culver. He also testified the discoloration or marks about the neck were the result of a tracheaec-

tomy performed to help this man breathe before he died. Presumably, the opening for the tracheaectomy was in the identical location of the entrance of the gunshot wound. The appellant attempts to equate this photograph with the photograph discussed in *Kiefer v. State, supra*. We find there is little support for this position, for in the *Kiefer* photograph it showed the hands of the surgeon in the body of the victim while performing an autopsy. We therefore hold that the trial court committed no reversible error in admitting state's exhibits number 8 and 9 in the evidence in the case at bar; therefore, specification #5 of the appellant's motion for new trial is without merit, and the trial court committed no error in overruling the same.

## POINTS SIX (6) AND EIGHT (8).

We will group and consider specifications #6 and #8 of the motion for a new trial together as both contentions of error are challenges to the sufficiency of the evidence. More specifically, asserted error #6 urges the proposition that the state failed to prove malice and purpose. Therefore the appellant's motions for a directed verdict at the close of the state's case-in-chief and at the conclusion of all the evidence should have been granted.

Murder in the second degree is defined by statute as follows:

"Whoever purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree . . ." Ind. Stat. Ann. § 10-3404 (1956 Repl.)

Thus defined the crime of second degree murder embraces the following essential elements:

1. The killing of a human being.
2. The accompaniment of such killing with malice and purpose. See *Helms v. State* (1968), 251 Ind.

335, 241 N. E. 2d 244; *Dickinson v. State* (1944), 222 Ind. 551, 55 N. E. 2d 325; *Landreth v. State* (1930), 201 Ind. 691, 171 N. E. 192; *Brooks v. State* (1883), 90 Ind. 428.

In *Maxey v. State* (1969), 251 Ind. 645, 244 N. E. 2d 650, 657, we stated:

". . . It is well established in Indiana that the use of a deadly weapon against an unarmed person in a manner likely to produce death is sufficient evidence from which to conclude malice existed."

The elements of malice and purpose need not be proved by direct evidence, but may be inferred from the circumstances of the case. *Maxey v. State, supra; Helms v. State, supra; Sparks v. State* (1964), 245 Ind. 245, 195 N. E. 2d 469, rehearing granted on other grounds, 245 Ind. 250, 196 N. E. 2d 748; *Miller v. State* (1962), 242 Ind. 678, 181 N. E. 2d 633.

A conviction will be sustained if there is substantial evidence of probative value to sustain each material element of the crime charged. When the question of the sufficiency of the evidence is raised this court will consider that evidence most favorable to the state together with all inferences to be drawn therefrom. *Harris v. State* (1968), 249 Ind. 681, 231 N. E. 2d 800; *Coach v. State* (1968), 250 Ind. 226, 235 N. E. 2d 493.

The record of the testimony by Sandra Hedges, the daughter of the deceased, and Ronald Hewitt indicates that both of them heard shots fired and both saw the appellant and the deceased struggling. The appellant had a .32 caliber pistol in his hand, and the deceased was shot and killed with said pistol. Ronald Hewitt, who came to the aid of the deceased during the struggle, was also shot with the same pistol. Thus, there was sufficient evidence from which reasonable inferences could be drawn to establish the element of malice under the case law hereinabove set forth.

Moreover, the law has always stated that an individual intends the natural and probable consequences of his acts and such intent implies purpose by operation of law. *Newport v. State* (1894), 140 Ind. 299, 39 N. E. 926; *Pitts v. State* (1939), 216 Ind. 168, 23 N. E. 2d 673.

Consequently, we hold that no error was committed by the trial court in refusing to grant the appellant's motions for directed verdicts or in overruling of specification #6 of appellant's motion for new trial.

Specification #8 of the motion for new trial asserts error based upon the insufficiency of the evidence to sustain the verdict of second degree murder and judgment thereon. The appellant in his brief has failed to make an argument challenging the sufficiency of the evidence upon any grounds other than its insufficiency to sustain the essential elements of malice and purpose as heretofore discussed. Therefore, we do not deem it necessary to detail a summary of all the evidence in the case. Suffice it to say the record reveals there was substantial evidence of probative value to sustain the verdict of the jury as regards the requisite malice and purposefulness. We hold that the trial court committed no error in overruling specification #8 of the appellant's motion for new trial.

## POINT SEVEN (7).

Under specification #7, the appellant contends that the verdict of the jury and judgment of the trial court was contrary to law. The sole assertion thereunder is that the jury committed error by returning a verdict which included a finding that the appellant ". . . be imprisoned in the state's prison during life." The appellant under specification #7 contends that the ". . . jury had no right or authority to consider the potential punishment, since punishment for second degree murder has been determined by the legislature, . . ." and therefore that the verdict was contrary to law, citing in sup-

port thereof *Rowe v. State* (1968), 250 Ind. 547, 237 N. E. 2d 576. In *Rowe,* this court stated that it was improper for the prosecuting attorney in his final argument to the jury to question the propriety of a verdict of manslaughter instead of second degree murder for the reason that the offender would be paroled in approximately two years. Therein, we held that such remarks were improper because it was the province of the jury only to determine the guilt or innocence of the defendant. The matter of parole as authorized by a separate statute and rules and regulation of the Department of Correction was solely within the province of the executive department as implemented by statute. In the case at bar, there is no indication that the jury invaded the province of the executive department. Therefore, *Rowe* has no applicability to the case at bar, and we so hold. Moreover, the jury in handing down their verdict merely followed the language of Ind. Ann. Stat. § 10-3404 (1956 Repl.) which states:

> "Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, *and on conviction, shall be imprisoned in the state prison* during life" (our emphasis).

█ Ind. Ann. Stat. §9-1819 (1956 Repl.) provides:

> "When the defendant is found guilty the jury, except in the cases provided for, in the next three (two) sections, must state, in the verdict the amount of fine and punishment to be inflicted . . ."

The two following sections Ind. Ann. Stat. (1956 Repl.) § 9-1820 and 9-1821 refer to (1) indeterminate sentences, for felonies other than for murder, to the Indiana Reformatory, and, (2) to indeterminate sentences to the Indiana State Prison, on all felonies except treason and murder, respectively. Therefore, since the appellant was found guilty of murder in the second degree the form of the jury verdict was proper.

The trial court committed no error in overruling specification #7 of appellant's motion for new trial.

For all the foregoing reasons, we hold that the appellant has failed to demonstrate any reversible error, and the judgment of the trial court should be affirmed.

Judgment affirmed.

DeBruler, C. J., Arterburn and Givan, JJ., concur.

Jackson, J., dissents with opinion.

## DISSENTING OPINION.

JACKSON, J.—I dissent from the majority opinion on the narrow ground that the State of Indiana did not file any counter affidavit or affidavits to appellant's Motion for Change of Venue from the County, nor did the State of Indiana offer evidence in rebuttal or repudiation of the testimony adduced in appellant's behalf in support of his motion.

There is no dispute as to the fact that testimony was given and heard in support of appellant's Motion for Change of Venue from the County. There is no dispute as to the fact that the State offered no evidence to contradict or offset such evidence.

The failure of the State to contradict the affidavit or affidavits and the evidence in support of the Motion for Change of Venue, in my opinion, constitutes an admission of the truth thereof.

The mere fact that the court after the hearing held that the defendant was not entitled to a change of venue from the county does not and can not change that admission. The record discloses that two witnesses testified on behalf of the appellant and that five exhibits [Numbers (1) to (5) inclusive] were introduced in support of appellant's motion. Under the circumstances here present it is my opinion the denial of the Motion for Change of Venue constituted an abuse of discretion.

The judgment should be reversed and remanded to the trial court with instructions to grant appellant's Motion for Change of Venue from the County.

NOTE.—Reported in 247 N. E. 2d 76.