JENNA PAULINE KELSIE *v*. STATE OF INDIANA.

[No. 1274S241. Filed September 21, 1976. Rehearing denied November 1, 1976.]

364

*James D. Lopp, Sr., James D. Lopp, Jr.,* of Evansville, for appellant.

*Theodore L. Sendak,* Attorney General, *J. Roland Duvall,* Deputy Attorney General, for appellee.

ARTERBURN, J.—On May 21, 1974, the Appellant, Jenna Pauline Kelsie, was found guilty of the second degree murder of Dale Leon Graham. The jury returned its verdict without stating the sentence to be imposed. On June 7, 1974, the trial judge sentenced the Appellant to imprisonment for a period of not less than fifteen nor more than twenty-five years. A motion to correct errors was filed on July 31, 1974. Arguments were heard on the motion and on August 26, 1974, the trial court took the matter under advisement. The motion was overruled on September 23, 1974.

## I.

In order to set out the facts of this case, we consider first the contentions of the Appellant regarding the sufficiency of the evidence. It is asserted that the verdict is not supported by sufficient evidence upon all the necessary elements of the crime charged, second degree murder. It is also contended that the verdict is contrary to law because "the evidence did not negate the elements of self-defense by substantial evidence of probative value."

It is well-established that this court, in determining the sufficiency of evidence, does not judge the credibility of witnesses or weigh evidence. We look at the evidence most favorable to the State and the reasonable inferences to be drawn from that evidence. A verdict will not be disturbed if there is substantial evidence of probative value from which the trier of fact could reasonably infer that the defendant was guilty beyond a reasonable doubt. *Young* v. *State*, (1975) 264 Ind. 14, 332 N.E.2d 103; *Blackburn* v. *State*, (1973) 260 Ind. 5, 291 N.E.2d 686; *Jackson* v. *State*, (1971) 257 Ind. 477, 275 N.E.2d 538.

The evidence at trial revealed that on the early evening of October 5, 1973, the Appellant drove to Boonville, Indiana from her home in Evansville. She had divorced the decedent about a week before, having been separated from him since July of 1973. The Appellant testified that she drove to Boonville to see if she had received any mail there and then

decided to see a friend. While in Boonville, the Appellant went to a tavern and had some drinks with friends. While entering the tavern, she noticed that her ex-husband was in another bar next door. During the course of the night, the Appellant asked a friend to go and tell the decedent to join them. She opened her purse and displayed to him an automatic pistol, saying she was "aimin' to kill the son-of-a-bitch." The friend did not think that the statement was made seriously.

The decedent subsequently joined the Appellant and her companions. At about 1:00 a.m., October 6, 1973, he left the tavern, following two women with whom he was acquainted. He was talking to one of them when the Appellant also came out of the tavern. An argument ensued between the three persons which developed into a loud exchange of swearing, obscenities and name-calling. The Appellant, standing by her automobile parked nearby, was seen holding a gun in her hand.

The argument ended when the decedent's two female friends left and the decedent returned to the tavern in which he had started his evening. At approximately 1:20 a.m. the Appellant began honking the horn of her car. The decedent was told that "one of your women is wantin' you out there or honkin for you." He went outside and was seen getting into the passenger side of the Appellant's automobile. A scuffle then took place in the car and three shots were heard. The Appellant was identified as the woman behind the steering wheel. She admitted shooting the decedent, asserting that it was in self-defense.

The Appellant's sufficiency argument consists largely of a summary of testimony which, it is asserted, "conclusively shows that said defendant shot the decedent in self-defense." This asks us to weigh the evidence and judge the credibility of witnesses, which we cannot do. We think that the evidence was sufficient to establish that the Appellant killed the decedent with purpose and malice and thus committed second degree murder. Ind. Code § 35-1-54-1 (Burns 1975). The deliberate use of a deadly weapon in a

manner likely to cause death or great bodily harm permits an inference that the defendant was acting with malice and purpose. *White* v. *State,* (1976) 265 Ind. 32, 349 N.E.2d 156. It is the province of the jury to determine the credibility of witnesses and to determine whether it will believe all, none, or any part of a witness's testimony, and the determination of whether a homicidal act was carried out in self-defense is an ultimate fact to be decided by the jury. *Swift* v. *State,* (1961) 242 Ind. 87, 176 N.E.2d 117. Put simply, the jury was not required to believe the Appellant's claim of self-defense. We find no error here.

## II.

The Appellant also asserts that the trial court erred in overruling motions to strike parts of the indictment and to dismiss the indictment. The indictment in this case read as follows:

"The Grand Jurors of Warrick County, in the State of Indiana, good and lawful persons, duly and legally impaneled, charged and sworn to inquire into felonies, and certain misdemeanors, in and for the body of said County of Warrick in the name and by the authority of the State of Indiana, on their oaths present that JENNA PAULINE KELSIE, on the 6th day of October, 1973, at Warrick County, in the State of Indiana, did then and there unlawfully, feloniously, purposely, and maliciously, but without premeditation, kill and murder one DALE LEON GRAHAM, her former husband, a human being, by then and there unlawfully, feloniously, purposely, and maliciously, but without premeditation, shooting at and against the said DALE LEON GRAHAM, with a certain pistol, loaded and charged with gunpowder and bullets, thereby mortally wounding the said DALE LEON GRAHAM with one or more of said bullets, discharged and shot as aforesaid, said shooting having occurred in the front seat of a parked automobile which was in the possession of the said JENNA PAULINE KELSIE and was located at the time of said shooting in a public parking place in front of Kenny's Tavern located at 118 South Third Street, Boonville, Warrick County, Indiana, from which mortal wound the said DALE LEON GRAHAM died shortly thereafter on said 6th day of October, 1973. And so the Grand Jurors aforesaid, upon their oaths, do present and charge that the

said JENNA PAULINE KELSIE did unlawfully, feloniously, purposely, and maliciously, but without premeditation, kill and murder the said Dale Leon Graham in the manner and form aforesaid, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Indiana."

The Appellant's motion to strike parts of the indictment sought to strike the following: "and murder"; "her former husband"; "at and against"; "with one or more of said bullets"; and "said shooting having occurred in the front seat of a parked automobile which was in the possession of said Jenna Pauline Kelsie and was located at the time of said shooting in a parking place in front of Kenny's Tavern located at 118 South Third Street, Boonville, Warrick County, Indiana." The trial court subsequently struck from the indictment the words "her former husband." The motion was overruled in respect to the other wording challenged.

The Appellant contends that the words so permitted by the trial court are "surplusage and detrimental to the accused and wholly foreign and prejudicial." This contention is based upon language contained in *Chambers* v. *State*, (1937) 212 Ind. 667 at 670, 10 N.E. 2d 735 at 736: "This court on several occasions has held that an indictment or affidavit is not subject to a motion to quash because it contains evidentiary matters; that such matters will be treated as surplusage and are not prejudicial to the rights of the defendant, unless they are wholly foreign to the subject-matter of the indictment or affidavit." While the Appellant's contention arises out of a different context in terms of procedure (a "motion to strike" as opposed to a motion to quash) and in terms of statutory basis (the statutes regarding indictments have been amended since *Chambers*), we think that the controlling principle here remains. We can find no reversible error if the Appellant was not prejudiced. *Cf. Doss* v. *State*, (1971) 256 Ind. 174, 267 N.E.2d 385. The language complained of here is not of the character sufficient to render the indictment defective and we can find no error in the overruling of the Appellant's motion to strike.

The Appellant's motion to dismiss the indictment asserted that the alleged crime was not stated with sufficient certainty and that the facts stated in the indictment did not constitute a crime. The crime of second degree murder is defined as "[w]hoever, purposely and maliciously, but without premeditation, kills any human being. . . ." Ind. Code § 35-1-54-1 (Burns 1975). A simple reading of the indictment indicates that the facts were stated with sufficient certainty and constituted a crime under the statutory definition. The Appellant's supporting arguments are equally unpersuasive. It is contended that the indictment failed to allege the exact time of the crime. The indictment need only state the time of the crime "with sufficient particularity to show that the offense was committed within the statute of limitations." Ind. Code § 35-3.1-1-2 (Burns 1975). Time of death is not of the essence in a case of murder. *Buchanan* v. *State*, (1975) 263 Ind. 360, 332 N.E.2d 213. Assertions that language in the indictment was prejudicial merely restates contentions of the Appellant's motion to strike. We find no language so prejudicial that the indictment should have been dismissed.

### III.

Error No. 2 set out in the Appellant's motion to correct errors states that the trial court erred in overruling defense objections to the appointment of a "special prosecutor." We have reviewed the record and find nothing which indicates that a "special prosecutor" was appointed. The relevant orderbook entry reads simply: "Comes now Robert W. Lensing and appears of counsel for the State of Indiana." The record shows that this attorney worked with and under the supervision of the Warrick County prosecutor, who was present at all stages of the proceedings.

The record further reflects that the prosecuting attorney requested that this attorney be permitted to appear for the State, and that the trial court appointed him for that purpose. "The court in a criminal prosecution may allow the prosecut-

ing attorney additional counsel, and assisting counsel may be employed by one interested in the prosecution." 8 I.L.E. *Criminal Law* § 395 at 43 (1971). The trial court did not err here.

## IV.

The Appellant also presents the question of whether the trial court erred in refusing to give to the jury Defendant's Instructions Nos. 4, 5, 6, 7, 8, 9, 11, 12 and 13. We note at the outset that the Appellant tendered thirteen instructions to the trial court, three of which were accepted and given to the jury. A defendant is permitted under our criminal rules to tender only ten instructions, unless the trial court fixes a greater number in a particular case. Ind. R. Crim. P. 8. No error may be predicated upon the refusal to give instructions in excess of the number permitted under the rule. *Buchanan* v. *State, supra.* Since the trial court did not exercise its discretion and permit the tender of more than ten instructions in this case, the Appellant cannot complain of the court's refusal of at least three of his tendered instructions.

More importantly, however, we find that the substance of these tendered instructions was contained in instructions which were given by the trial court. It is not an error to refuse an instruction which is adequately covered by other instructions which are given. *Fuller* v. *State,* (1973) 261 Ind. 376, 304 N.E.2d 305. Defendant's Instructions Nos. 4, 5, 6, 7, 8 and 12 concerned the use of force in self-defense. This was adequately covered by Defendant's Instruction No. 2 and Court's Instructions Nos. 23, 35, 23.33 and 23.33A, which were given to the jury. Defendant's Instructions Nos. 9 and 11 essentially stated that the use of a deadly weapon in self-defense is not evidence of malice. This same principle was covered by Defendant's Instruction No. 10, which the trial court gave.

The Appellant apparently argues that since a jury is composed of laymen, repetition is necessary to communicate to it

principles of law. We implicitly rejected this proposition in our promulgation of Ind. R. Crim. P. 8, and have consistently rejected this notion in our opinions. *See Fuller* v. *State, supra.* The Appellant has not included in his brief any argument or citation regarding Defendant's Instruction No. 13. The issue of whether that instruction was properly refused is thus waived. Ind. R. Ap. P. 8.3 (A) (7) ; *Green* v. *State,* (1971) 257 Ind. 244, 274 N.E.2d 267.

The Appellant also challenges Court's Preliminary Instruction No. 1.13, which was given over defense objection:

"1.13 : PROTECTION OF THE INNOCENT

The Rule of law which presumes that the defendant is innocent and which requires proof beyond a reasonable doubt is not intended to allow anyone who is guilty of crime to escape punishment. It is a humane rule to protect the innocent and to guard, as much as possible, against the danger of convicting a person who is innocent and unjustly accused of crime."

This instruction was but one of several instructions given to the jury on the presumption of innocence and the burden of proof beyond a reasonable doubt. All instructions are to be read together and construed as a whole. *Cockrum* v. *State,* (1968) 250 Ind. 366, 234 N.E.2d 479; 8A I.L.E. *Criminal Law* § 581 (1971). The instruction complained of here is correct and, in the context of the other instructions given, was not so prosecution-oriented that the Appellant can be said to have been prejudiced.

The Appellant's contention that the trial court erred because it did not instruct the jury on the penalty for manslaughter, a lesser included offense of second degree murder, was not put before the trial court in a timely fashion. Since no timely objection to the Court's instructions in this regard was made, and no instruction on the matter was tendered by the Appellant, this issue is not properly before us for consideration. *Mireles* v. *State,* (1973) 261 Ind. 64, 300 N.E.2d 350. In a related issue, the Appellant asserts that the form for returning a verdict of guilty of manslaughter provided the jury by

the trial court was defective because it did not include a statement of the punishment for the offense. By statute, a verdict of guilty for a felony other than murder or treason is not required to state the punishment. Ind. Code §§ 35-8-2-1—35-8-2-3 (Burns 1975).

## V.

We address finally the contentions that the trial court improperly sentenced the Appellant. Specifically, it is asserted that the form of the verdict for second degree murder submitted to the jury was improper because it failed to allow the jury to fix a penalty. It is also asserted that the trial court erred when it, rather than the jury, sentenced the Appellant. We agree that the trial court erred here. Under the circumstances of this case, however, we think that the error was harmless.

The second degree murder statute, Ind. Code § 35-1-54-1 (Burns 1975), provides for alternative sentences:

"Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and, on conviction, shall be imprisoned in the state prison during life, or shall be imprisoned in the state prison not less than fifteen nor more than twenty-five years."

Ind. Code § 35-8-2-1 (Burns 1975) provides for jury sentencing with exceptions:

"When the defendant is found guilty the jury, except in the cases provided for, in the next three [two] sections, must state, in the verdict, the amount of fine and the punishment to be inflicted; where the plea is guilty, or the trial is by the court, the court, subject to the same exception, shall assess the amount of fine and fix the punishment to be inflicted."

Ind. Code § 35-8-2-2 (Burns 1975) and Ind. Code § 35-8-2-3 (Burns 1975) provide the exceptions, convictions for murder or treason. In this case, the statutes clearly require the jury to state the sentence in its verdict. *Brown* v. *State*, (1969) 252 Ind. 161, 247 N.E.2d 76. However, the sentence imposed by the court here was the minimum sentence provided for

under the second degree murder statute. The Appellant thus suffered no harm. The jury's verdict, as well as the trial court's sentence, should stand.

We recognize that there has been some confusion among the cases on the question here. Some of these cases may be distinguished on the facts, since the sentences imposed were greater than the minimum and, obviously, the defendants may have been prejudiced. *Crooks* v. *State*, (1971) 256 Ind. 72, 267 N.E.2d 52; *West* v. *State*, (1950) 228 Ind. 431, 92 N.E.2d 852; *Limeberry* v. *State*, (1945) 223 Ind. 622, 63 N.E.2d 697. In *Lane* v. *Hobbs*, (1965) 246 Ind. 640, 206 N.E.2d 182, we relied on Rule 2-40B as a vehicle to correct an erroneous sentence.

In *Kolb* v. *State*, (1972) 258 Ind. 469, 282 N.E.2d 541, the contention was made by the defendant, having been tried on two charges, that because the jury had left blank the sentence on the verdict on one charge, the verdict on the charge on which the jury properly fixed a sentence was invalid. We did say that the proper procedure for the court would have been to send the incomplete verdict back to the jury for its completion, which is true. We concluded that "the fact that one verdict is defective does not necssarily mean that the verdict on the other count is automatically reversible." 258 Ind. at 481. However, we think that the more logical reasoning where the Appellant can show no harm or prejudice, is stated in *Palmer* v. *State*, (1926) 198 Ind. 73 at 77, 152 N.E. 607 at 608:

> "The court, after overruling the motion for a *venire de novo*, pronounced sentence on appellant that he be imprisoned in the Indiana State Prison for the determinate period of ten years. As that was the shortest period of time for which the jury lawfully could have found that he should be imprisoned, if he was guilty of the offense charged, appellant was not harmed by the failure of the verdict to fix the punishment, nor by the action of the court in overruling his motion for a *venire do novo:*"

Procedural matters as to fixing sentences of the character involved here are not always such that an error therein requires a new trial. This is particularly true where the de-

fendant can show no harm. We have made available under Ind. R. P.C. 1, § 1(a)(3), a remedy for a defendant to have a sentence corrected where he has been harmed.

The judgment of the trial court is affirmd.

Givan, C.J., Hunter, Prentice, JJ., concur; DeBruler, J., dissents with opinion.

## DISSENTING OPINION

### I

DEBRULER, J.—The majority properly rejects appellant's contention that her conviction should be reversed because a "special prosecutor" was improperly appointed, holding that the record fails to show that Mr. Lensing, the attorney in question, was a special prosecutor. However I believe that if this case were to be retried, the trial court should inquire into the circumstances surrounding Mr. Lensing's appearance before permitting him to appear on behalf of the State.

Appellant has specifically alleged that the private attorney assisting the prosecutor was employed by relatives of the victim to assist in securing appellant's conviction. I feel that this practice, if it occurred in this case constitutes the condoning by the trial court of "private prosecutors," which practice should not be permitted in the prosecution of criminal offenses.

The majority cites the Indiana Law Encyclopedia for the proposition that a private person interested in the prosecution of an accused may employ counsel who may assist the prosecuting attorney. 8A I.L.E. *Criminal Law* § 395 at p. 43 (1971). The encyclopedia cites the 1890 case of *Keyes* v. *State,* 122 Ind. 527, 23 N.E. 1097. I feel that this case is inconsistent with modern views on the nature of the duties of the prosecuting attorney.

> "In an early day in England private parties prosecuted criminal wrongs which they suffered. They obtained an indictment from a grand jury, and it became the duty and the privilege of the person injured to provide a prosecutor at his own expense to prosecute the indicted person. Our scheme of government has changed all this. It is now

deemed the better public policy to provide for the public prosecution of public wrongs without any interference on the part of private parties, although they may have been injured in a private capacity different from the general public injury that accrues to society when a crime is committed. So under our system we have private prosecution for private wrongs and public prosecution for public wrongs. Our scheme contemplates that an impartial man selected by the electors of the county shall prosecute all criminal actions in the county unbiased by the desires of complaining witnesses or that of the defendant." *State* v. *Peterson,* (1928) 195 Wis. 351, 218 N.W. 367, 369.

The public policy alluded to by the Supreme Court of Wisconsin is no different from that of Indiana. Our statutes provided for the office of a prosecuting attorney for each judicial circuit, Ind. Code § 33-14-1-1, whose duty it is to prosecute criminal actions. Ind. Code § 33-14-1-4. All prosecutions are brought in the name of the State, by the filing of a pleading by the prosecuting attorney. Ind. Code § 35-3.1-1-1(a) and (b). Only the prosecuting attorney can cause voluntary dismissal of a criminal cause. Ind. Code § 35-3.1-1-13. While in common parlance we speak of individuals aggrieved by a crime "bringing charges" or "dropping charges," our laws actually entrust such powers solely to the elected representative of the public, the prosecuting attorney.

The American Bar Association's *Standards Relating to the Prosecution Function* provide:

"The duty of the prosecutor is to seek justice, not merely to convict." § 1.1(c) (1971 Approved Draft).

The commentary to this section states:

"Although the prosecutor operates within the adversary system, it is fundamental that his obligation is to protect the innocent as well as convict the guilty, to guard the rights of the accused as well as to enforce the rights of the public." Com. to § 1.1 at p. 44.

Comment to a later section states that participation by a public official "gives greater assurance that the rights of the accused will be respected than when the victim controls the process." Com. to § 2.1 at p. 49.

In Indiana the prosecuting attorney's duties are established in Canon 7 of the Code of Professional Responsibility. EC 7-13 provides that:

> "The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict. . . ."

DR 7-103 of the Code charges the prosecutor with the duties not to institute unfounded charges and to disclose exculpatory evidence to the defendant. Violation of these duties is grounds for disciplinary action.

The foregoing should make clear that under our system the duty of prosecution is vested in a responsible public official whose duty lies to the public and to justice. The responsibility of a private attorney is to his client. EC 5-1, 5-21, 7-1; DR 7-101.

> "Conversely, a privately retained attorney owes his client individual allegiance, and once employed he must not act for an interest even slightly adverse to that of his client in the same general matter. Therefore, in view of the ethical and judicial restrictions imposed on the public prosecutor and the generally recognized loyalties of the private advocate, 'private prosecutor' is a contradiction in terms. The high standard of impartiality required of a prosecutor realistically cannot be expected of the private advocate." *Private Prosecution—the Entrenched Anomaly*, 50 N.Car. L. Rev. 1171, 1173 (1972)

For this reason the practice of permitting private attorneys, retained by persons interested in the outcome of a criminal prosecution, to participate in the trial of an accused, should be ended.

> "The practice invites error from an excess of zeal which might well be avoided by leaving the conduct of a criminal prosecution entirely in the hands of the elected official upon whom such duty has been placed." *State* v. *Harrington*, (Mo. 1976) 534 S.W.2d 44.

## II.

In its opinion, the majority does not set out any of the substantial evidence of self-defense which was in the record, much of which was corroborated or not contested. The de-

cedent had severely beaten appellant around the eyes and the face and had bitten her on the upper arm in the few minutes of struggle before she shot him.

When appellant honked for the decedent to come out, she talked to him through the window. Then he asked her to lower the car window, and he unlocked the door and got in. They talked about a minute or two and then began wrestling. Decedent had appellant in a headlock and was hitting up at her. She yelled out for him to stop five or six times, then reached around, got hold of her gun and shot him.

The decedent was 5'11" and weighed 185 pounds. He had a long history of terrible violence. Different witnesses testified to his acts toward them or in their presence. A former wife, who had tried repeatedly to get him to seek medical help, testified that he bit a chunk out of one daughter's arm, beat her son with a pair of steel-toed boots so severely that she had to take the child to the doctor for his kidneys, and struck her other daughter with a belt until the blood was pouring out. She stated that the decedent did these things for no apparent reason at all. He also chased after an old man with a chain saw. He stomped his wife with the heels of his boots. "He'd be in a good mood one minute and then all of a sudden, watch out. He just snapped," she testified. When his former wife heard that decedent and appellant were having marital difficulties, she began carrying brass knuckles, because she knew decedent would start coming around and bothering her and her children and she was scared of him.

One of the decedent's good friends had a small argument with him. They were in a car together and decided to fight for fun. They got out and started fighting, and decedent kicked him with his cowboy boots. He broke the friend's nose. The friend admitted that Dale might just fly off the handle.

Appellant herself had experienced decedent's violent acts. On one occasion, she had arranged to meet Dale at a friend's house. When he arrived, he started beating her, pulling her

hair, and hitting her in the face. He threw her on the couch and placed his foot on her stomach, with his steel toed boots on. He told her he was going to stomp her guts out. Her girlfriend reminded him that appellant had just had surgery and that he could hurt her bad, so he confined himself to spitting in her face and hitting her and then wanted her to go and have dinner with him. Since he had torn off her clothes and under garments, blacked her eye, and bruised her arms, she refused.

On another occasion, during the separation, a month before the crime, appellant was driving out to their house, where she was living, when she met decedent in his truck. She told him that she needed water at the house. He got furious. He pulled off his boot and hit the top of the car where she was sitting. He reached through the window, grabbed her sunglasses off her face, and twisted them and threw them on the ground and stomped on them. She drove off and he followed her. Dale passed her and blocked her way. He got out of his truck and walked back toward her car. She backed up to try to get away from him. He got back in the truck and started backing into her car, pushing all but one side of the front into a ditch. He then got out and came back to her car with a two or three foot long iron bar and began beating the car all over. He jumped on the hood and crouched down and held the bar up as if he were going to poke the bar through the window at appellant. She begged him to please quit, then fell back against the seat almost passing out. Then he jumped off and left.

On Tuesday, Wednesday and Thursday before the crime on Friday, decedent had left letters at appellant's door. They were entered in evidence. The third letter began by reciting decedent's love for appellant but ended by threatening the life of a man he thought she was seeing. "You don't no how close he came to ben shoot between his eyes. . . . And I will not miss the next time. . . ."

I set out this evidence in this opinion to make more pointed the self-defense claim made by appellant. The State had the

burden of proving that appellant had not acted in self-defense. The State had to show that she did not act without fault; was not in a place where she had a right to be; or was not in real danger of death or great bodily harm or could not have perceived herself as being in such danger. *King v. State*, (1968) 249 Ind. 699, 234 N.E.2d 465, 468. The jury did not believe appellant's self-defense claim. The evidence and inferences therefrom would have permitted the jury to conclude that appellant did not act without fault, since she armed herself for possible trouble with the decedent. The jury could also have determined that, as brutal as decedent's beating was, appellant could not have perceived herself to be in danger of great bodily harm. We cannot weigh the evidence. There was evidence of probative value to support the jury's determination that appellant did not act in self-defense.

The jury's knowledge of appellant's genuine and reasonable fear of harm, and that she shot him in a violent struggle is relevant also to the issue of sentencing, which is considered in part III. We do not and cannot know whether the jury might have found appellant guilty only of manslaughter had the jurors been properly informed of the mandatory fifteen to twenty-five year sentence. The sentence helps to define the crime of second degree murder, and failure to let the jury know the sentence kept them from making a truly informed decision.

### III.

In her motion to correct errors and on appeal, appellant objected to the court's forms of verdict and to its failure to furnish proper forms after she had timely notified it of the error. She also objected to the court's denying her objections to its pronouncement of judgment and sentence based on the verdict.

At trial, after both sides had rested, the trial court gave the parties an opportunity to examine the court's instructions and to tender their own. One of the court's instructions defined the offense of second degree murder in the language

of the statute and then set out the elements of the offense. The court's final instruction read, in relevant part:

"You will be provided with 3 forms of verdict. Only when all twelve of you have agreed upon your verdict, then will you select the form which reflects that verdict and your Foreman will sign it. When this is done, notify the bailiff and he will bring you into open court.

The forms of verdict which you will receive read as follows:

(HERE READ EACH FORM)"

The three jury verdict forms read:

"We, the Jury, find the defendant, Jenna Pauline Kelsie, guilty of the charge of Murder in the Second Degree." .

"We, the Jury, find the defendant, Jenna Pauline Kelsie, not guilty of the charge of Murder in the Second Degree but guilty of the charge of Manslaughter."

"We, the Jury, find the defendant, Jenna Pauline Kelsie, not guilty."

After the jury had retired, appellant's counsel objected to the verdict forms:

"Let the record show the defendant, prior to the return of the jury of its verdict and while the jury is deliberating, the defendant's attorneys first having knowledge of the form of the verdicts submitted to the jury, now objects to the Court's verdicts for the jury to fix and to find whether or not the defendant is guilty of murder in the second degree. The defendant states and objects that the verdicts should be that the jury finds the defendant guilty of murder in the second degree and fixes the penalty at life imprisonment and there should be another verdict submitted to the jury that, we, the jury find the defendant guilty of murder in the second degree and fix the penalty of imprisonment of not less than fifteen nor more than twenty-five years.

It is the defendant's position that the jury is to fix the penalty of the second degree murder charge and the defendant now requests the Court to submit to the jury verdicts fixing the penalty of life imprisonment and also a verdict for the jury to fix the penalty of not less than fifteen nor more than twenty-five years and withdraw the general verdict of guilty of second degree murder.

The defendant further objects to the Court giving, submitting the verdict of manslaughter and without stating in said verdict that the jury finds the defendant guilty of

manslaughter and said defendant shall be imprisoned for not less than two nor more than twenty-one years. That said verdict should be specific and not a general verdict and the defendant further states she or her attorneys were not extended a copy of the verdicts."

The court denied her objection and motion. Thereafter, the jury returned its verdict:

"We, the Jury, find the defendant, Jenna Pauline Kelsie, guilty of the charge of Murder in the Second Degree."

Appellant filed objections to the court's pronouncing judgment and sentence. The court heard argument, overruled appellant's objections, and sentenced her to fifteen to twenty-five years.

The majority opinion sets out the second degree murder statute, Ind. Code § 35-1-54-1, which provides for alternative sentences: life imprisonment, or not less than fifteen nor more than twenty-five years. The majority opinion also sets out the statutes, Ind. Code § 35-8-2-1 through 3, which provide that the jury "must state, in the verdict . . . the punishment to be inflicted," when the jury finds the defendant guilty of murder. See *Brown* v. *State,* (1969) 252 Ind. 161, 247 N.E.2d 76. The first statutes incorporating these provisions became law in 1897. *Miller* v. *State,* (1898) 149 Ind. 607, 49 N.E. 894.

In this case, neither the instructions nor the verdict forms informed the jurors of the punishment for second degree murder. Appellant objected while the jury was still deliberating, clearly before the jurors had been discharged.

As we recently stated in *Kolb* v. *State,* (1972) 258 Ind. 469, 481, 282 N.E.2d 541, 548, "the proper action for the judge would have been to send the incomplete verdict back to the jury for their completion," where the jury assessed no fine or punishment. Appellant asks that we set aside the verdict and grant her a new trial. On the basis of this case, I agree with appellant that the verdict is void and unenforcible for any purpose.

The law on this point is clear. In *Kolb,* appellant was charged with two offenses. The jury returned verdicts of

guilty for both offenses, but assessed no fine or punishment for one. Based on this verdict, the court pronounced judgment: "that the defendant is guilty of furnishing an alcoholic beverage to a minor, but that no punishment be assessed." On appeal, we noted the mandate of Ind. Code § 35-8-2-1 and reversed the judgment on the charge for which the jury had assessed no penalty. *Accord: Martin v. State,* (1958) 239 Ind. 174, 154 N.E.2d 714.

In *Crooks* v. *State,* (1971) 256 Ind. 72, 267 N.E.2d 52, the jury returned a verdict describing one offense and a sentence greater than the statute for that offense permitted. "Such a verdict in Indiana is void." It is "not enforcible against the appellant and the trial court erred in rendering judgment on the verdict." Accord: *Crotty* v. *State,* (1968) 250 Ind. 312, 236 N.E.2d 47; *Gaughan* v. *State,* (1918) 187 Ind. 334, 118 N.E. 565.

In *West* v. *State,* (1950) 228 Ind. 431, 440, 92 N.E.2d 852, 856, the verdict was void for two reasons. It did not provide for a fine, and it fixed the period of imprisonment at double the statutory maximum. "In such a situation the court cannot correct, modify or amend the verdict by adding a fine or reducing the time of imprisonment to bring it within the penalty provided by law." We reversed and granted a new trial.

In *Limeberry* v. *State,* (1945) 223 Ind. 622, 63 N.E.2d 697, the statute provided for a fine of not more than one thousand dollars "to which may be added imprisonment in the county jail not exceeding six months." The verdict provided for a fine of one dollar "and 6 months suspended sentence." We found these words surplusage, as the verdict was complete without them, and found that the court erred in trying to correct the sentence to six months on the Indiana State Farm.

"The court could not pass judgment of imprisonment on this verdict without ignoring the expressed intent of the jury. It was the duty of the court, of its own motion on observing the defect, to order the jury to retire and correct it. The duty of the jury was not completed until this was

done. What the jury might have done had it been ordered to retire and correct its verdict is unknown but its rights and duties under such circumstances are well expressed as follows:

> 'After a jury has been directed to return to the jury-room and amend or correct the verdict, *it has the power and right to change the whole verdict, and bring in an entirely different verdict.*'

2 Watson's Works Practice 447, § 1875; *Rush* v. *Pedigo* (1878), 63 Ind. 479, 485.

> The jury would have had a right to render a new verdict giving a time sentence of six months or for any lesser period, or it could have omitted the time sentence entirely. The defendant had a right to have the jury, not the court, pass on this important matter. Since the jury was discharged by the court, without first having fully performed its duty, it can not now be reassembled. Since the verdict is valid so far as the fine is concerned, the judgment rendered thereon is likewise valid. Since that part of the verdict concerning a time sentence is so ambiguous, that it is void, that part of the judgment fixing a time sentence is without foundation and is erroneous. *Hunnicutt* v. *Frauhigher* (1927), 199 Ind. 501, 158 N.E. 572." (Emphasis added.) 223 Ind. at 627-28.

We instructed the court below to revoke the sentence to the farm.

To the contrary is *Palmer* v. *State,* (1926) 198 Ind. 73, 152 N.E. 607. The jury assessed no punishment in a case where the statute provided for a sentence of "any determinate period not less than ten years nor more than twenty-five years." The trial court sentenced the defendant to ten years, and we affirmed, finding no harm to appellant. *See also, Lane* v. *Hobbs,* (1965) 246 Ind. 640, 651, 208 N.E.2d 182 (dissenting opinion at 246 Ind. 654-55), *cert. denied,* 383 U.S. 967 (1966).

Those who would contend that this judgment should be affirmed because appellant has not been harmed thereby ignore the clear policy of the Legislature that the jury, not the judge, shall fix the punishment upon the verdict of guilty. Appellant had the right to have the jury determine the punishment. If we were to hold that, since the judge assessed the minimum statutory sentence, the error was harmless, we would thwart

the intent of the statute and encourage judicial non-conformance with the legislative standards. Furthermore, it is not clear that appellant was not prejudiced. Had the court properly required the jury to retire again to determine the punishment, the jury could have returned a sentence of life imprisonment or could have returned an entirely different verdict. *Limeberry* v. *State, supra,* at 628. We do not know what this jury would have decided was the correct verdict, including the punishment. Therefore, we cannot determine that appellant was not prejudiced by the failure to have the jury know or set the punishment.

For failure of the jury to assess the punishment, as required by statute, I vote to reverse and grant appellant's motion for a new trial.

NOTE.—Reported at 354 N.E.2d 219.